Pee Curiam :
Pursuant to the order of reference in the above-entitled case, and the order of the court of November 20, 1961, on September 4, 1964, Trial Commissioner W. Ney Evans filed his report (including findings of fact, memorandum opinion and recommendation for conclusion of law). Plaintiff has filed exceptions and a brief excepting to the opinion and certain of the findings of fact. Defendant has filed a brief without exceptions requesting that the court affirm the findings of fact, conclusion and opinion of the trial commissioner. The case was submitted upon oral argument of counsel. Since the court agrees with the commissioner’s findings, his opinion and his recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. . Therefore, none of the plaintiffs is entitled to recover and the petition is dismissed. The court is of the view that this disposition is consistent with the opinion and the principles announced in Dugan v. Rank, 372 U.S. 609 (1963).
*558 REPORT AND OPINION OF COMMISSIONER*
Findings of Fact

Contents Findings

I.The Locale- 1-5
A. The Central Valley of California- 1-3
B. The San Joaquin River and Its Flood Plain- 4-5
1. The Course of the River- 4
2. The Channels and Segments of the River. 5
II.Waters of the San Joaquin Valley- 6-14
A. Surface Waters_ 6-7
1. The Flows of the River- 6
2. Channels of the River in the Santa Rita
Flood Plain_ 7
B. Subsurface Waters_ 8-14
1. General_ 8
2. Geology- 9
3. Ground Waters- 10
a. Marine Waters_ 11
b. Confined Fresh Water- 12
c. Unconfined Fresh Water-13-14
III. Appropriative, Prescriptive, and Riparian Rights-15-24
A. Irrigation_ 15-16
1. The Beginnings of Irrigation- 15
2. The Uses of Irrigation_ 16
B. Interferences and Modifications- 17-20
1. Electric Power Installations- 17
2. The Haines Decrees._ 18-19
3. Riparian Rights Above Gravelly Ford_ 20
C. Discharges' of the River-21-24
1. Volume of Flows_21-22
2. Upstream Diversions_ 23
3. Summary_ 24
IV. The Return Flow of Irrigation Water-■-25-26
A. Sources of Return Flow- 25
B. The Irrigation Efficiency- 26
V.The Central Valley Project_27-42
A. The Plan_27-29
B. Purchase of the Rights of Miller & Lux and
Others_ 30
C. The Agreement for the Exchange of Waters-31-33
1. Substitute Waters_32-33
D. Construction of Works and Impounding of
Water_34^-37
E. Operation of Canals-38-41
F. Recapitulation_ 42

*559
Contents Findings

VI.The Action. — __—_43-54
A. Filing — Trial_43-48
1. Relevant Dates_ 43
2. Gravamen of the Complaint_ 44
3. Identity of the Plaintiffs_ 45
4. The Lands_46-47
a. Location_ 46
b. Uses_ 47
5. Parcels of Land_ 48
B. Prior Litigation_49-50
1. Gerlach and Related Cases_ 49
2. The Wolfsen Case_ 50
C. Plaintiffs’ Theory of Their Case_51-54
1. Comprehensive Coverage.-_ 51
2. The Summary by Plaintiffs’ Counsel_ 52
3. Flexible Coverall_ 53
4. Valuation Evidence_ 54
VII.Predicates of Plaintiffs’ Rights_55-60
A. Plaintiffs and the Haines Decrees_ 55
B. Derivation of Title to Plaintiffs’ Lands_56-58
C. Riparian Rights of Plaintiffs’ Lands_ 59
D. Water From the CCID_ 60
VIII.Sources of the Lands’ Water Supplies_61-72
A. Surface Water_61-65
1. State of Nature_ 61
2. Before Friant Dam_ 62
3. After Friant Dam and Before the Delta-Mendota Canal_ 63
4. After the Delta-Mendota Canal_ 64
5. The Intrusion of the Friant-Kern Canal. 65
B. Subsurface Waters_ 66-68
1. The Ground Water Tables_66-67
2. Wellsl_ 68
C. Quantities of Water Available_ 69-72
1. Overall — Surface and Subsurface_ 69-71
2. Increáses in Use of Irrigation Water_ 72
IX.Salinity_._73-83
A. Nature of the Problem_ 73
B. The Concentration of Salts_74-76
1. In the Soils_ 74
2. In the Ground Water_75-76
C. Suitable Irrigation Water_77-80
D. Sound Irrigation Practices_81-83
1. Irrigation Water_ 81
2. Leaching_82-83

*560
Conteras Findings

X.Deprivations!_■-84-87
A. Grouping--- 84
B. Loss of the Flows of the River- 85
■ G. The Increase in Salinity_ 86
D. Campsites- 87
XI.Diminutions in Value_88-94
A. Grouping_ 88
B. Grasslands_ 89
C. Croplands_ 90-92
D. Campsites_93-94
1. The Camp in Being_ 93
2. Potential Campsites_ 94
XII.Specific Claims_ 95-113
A. Count 1_ 95
B. Count 2_ 96
C. Count 3_ 97
D. Count 4_ 98
E. Count 5_ 99
F. Count 6_ 100
G. Count 7_ 101
H. Count 8_ 102
I. Count 9_ 103
J. Count 10_ 104
K. Count 11- 105
L. Count 12_ 106
M. Count 13_ 107
N. Count 14_ 108
O. Count 15_ 109
P. Count 16_ 110
Q. Count 17_ 111
R. Count 18_ 112
S. Count 19_ 113
I. THE LOCALE
A. The Central Valley of California
1. The Central Valley of California, approximately 450 miles in length, lies between the Sierra Nevada Mountains on the east and the coastal ranges on the west. The northerly two-fifths of the valley is drained by the Sacramento Eiver system, and the southerly three-fifths is drained by the San Joaquin Eiver system. The Sacramento Eiver flows southerly, and the San Joaquin flows northwesterly. Both empty through the same delta into Suisun Bay, an arm of San Francisco Bay.
2. While the Sacramento Eiver has an annual runoff that *561 is approximately twice that of the San Joaquin River, abont three-fifths of the land in the Central Valley is accessible only to the San Joaquin. As a result, much of the water of the Sacramento River, prior to the construction of the Central Valley project, was dissipated needlessly into San Francisco Bay while large areas of fertile land in the southern part of the San Joaquin Valley remained undeveloped for lack of water. The State of California devised a plan under which the waters of the valley would be captured and used to greater advantage, which plan, although never carried out by the State, was subsequently taken over by the United States and became what is known generally as the Central Valley project.
3. The storage of waters, for use by the project, was achieved by the construction of Shasta Dam on the Sacramento River and Friant Dam on the San Joaquin River.
B. The San Joaquin River and Its Flood Plain
1. The Course of the River
4. The San Joaquin River is a natural watercourse, with well-defined channels and banks and with its source in the Sierra Nevada Mountains. It flows thence westerly to the plains of the San Joaquin Valley, which it enters at a point known as Friant. From this point, the river continues westward approximately 62 river miles to a point in the valley near the town of Mendota, where it is joined by the Fresno Slough of Kings River. It then turns abruptly toward the north and flows in a northwesterly direction until it reaches San Francisco Bay. Certain tributaries empty into the San Joaquin between Friant and Mendota, and other streams empty into the San Joaquin downstream from Mendota, contributing water in varying amounts to the river’s flow. Among the latter tributaries is the Merced River.
2. The Channels and Segments of the River
5. (a) In its course through the mountains and foothills and for some distance after it reaches the valley floor, the banks of the San Joaquin are so high as to preclude overflow, but after the river reaches a point known as Gravelly Ford, about 27 miles west of Friant, the banks become relatively *562 low. In a state of nature and during periods of high or floodwater, the river flowed out of its banks at places below this point and over and upon certain of the lands on either side of the river, either directly or after flowing into sloughs or branch channels. The flood plain (subject to overflow) extends approximately from Gravelly Ford to a point below the confluence of the San Joaquin River with the Merced River.
(b) Some 10 miles downstream from Mendota the river enters the southeastern end of what is known locally as the Santa Rita Flood Plain, which extends northwesterly a distance of 50 miles, in an average width of 7 miles.
(c) In terms of litigation involving the Central Valley project, the three main segments of the San Joaquin River are (i) the mountain watershed, from the reaches of the Sierra Nevada Mountains downstream to Friant; (ii) the area from Friant to Mendota; and (iii) the area downstream from Mendota.
The area from Friant to Mendota is subject to further division from Friant to Gravelly Ford and from Gravelly Ford to Mendota.
The area below Mendota is likewise subject to further division from Mendota downstream a distance of some 20 miles, being 10 miles below the southeastern end of the Santa Rita Flood Plain, and from that point to the delta at Suisun Bay.
The Santa Rita Flood Plain is also subject to further division from its southeastern end to the confluence of the Merced River with the San Joaquin River and from that confluence to the delta.
U. WATERS OE THE SAN JOAQUIN VALLEY
A. Surface Waters
1. The Flows of the River
6. The natural flow of the San Joaquin River has been and is variable in quantity, both over the years and in periods within the years. In the spring and summer the river is fed by the melting snowpack of the Sierra Nevada Mountains *563 and in the winter season by rainfall, supplemented by a small amount of snowmelt in the lower reaches of the mountains. As a result, there have 'been two periods of high water each year — the winter rain flood usually in December, January, and February, and the spring or summer snowmelt overflow usually in April, May, and June, with considerable variance in the times of commencement and duration, and the times of peak flow.
2. Channels of the River in the Santa Rita Flood Plain
7. (a) In the Santa Rita Flood Plain the river, in a state of nature and at the lowest stages of flow, was confined by natural banks to a sandy channel. This channel, except during stages of higher flow, hereinafter described, contained the water flowing in the river and is referred to as the low channel.
(b) At higher stages of the river in every year of ordinary flow, the waters spread farther, and for a time were confined to a wider channel by such natural banks. This wider channel is referred to as the high channel.
(c) In every year of ordinary flow in a state of nature, the river rose still higher, so that its waters were no longer confined to the high channel. The waters so overflowing the high channel banks and into and over the upland area moved slowly in the same general direction as the flow of the river in the low and high channels. This wide overflow was confined by rising ground on each side of the general overflow basin of the river. This is referred to as the overflow channel.
(d) In the area of overflow, the river flowed through numerous side channels, branch channels, and reaches of backwater, in addition to the main channel, such extra channels being referred to generally as sloughs. Some of the sloughs form networks; some have dead ends; some receive only backwater, and some receive water from the river and return it to the river at lower points, either directly or through connecting sloughs. Some sloughs branch off other sloughs. Some carry river water whenever there is water in the main channel; others carry river water only at higher river stages.
*564 B. Subsurface Waters
1. General
8. The surface flows of the river, at all stages, in the low channel, the high channel, or the overflow channel, are accompanied by subsurface flows of infinite complexity.
2. Geology
9. (a) At some point in remote geologic time, an inland sea lay between the Sierra Nevada Mountains and the coastal range in the area now occupied by much of the San Joaquin Valley, including the Santa Rita Flood Plain. Remnants of it are traceable in a body of saline connate water and marine sediments at considerable depths beneath the surface of the earth.
(b) One of the earlier episodes in the formation of the valley land mass was the accumulation or deposit of a layer of diatomaceous earth known as Corcoran clay, extending from a point north of the line between San Joaquin and Stanislaus Counties southward almost to Bakersfield and varying in width from 8 miles at the northern end to approximately 40 miles at the southern end. In the grassland areas of the Santa Rita Flood Plain, the top of the Corcoran clay is at a depth of approximately 290 feet below the surface.
(c) The cutting tools of the elements, powered by wind and Water, scarified the mountain slopes to send the soil down into the valley, in the process of which the river constructed its intricate network of aquifers and subterranean channels. The alluvial cone of the San Joaquin River begins at Friant and reaches its apex above Mendota.[1]
*565 3. Ground Waters
10. Beneath, the surface of the lands in suit, there are three distinct bodies of water. Although they lie underground, they are known as ground waters.
a.Marine Waters
11. At the greatest depth, at varying distances below the Corcoran clay, is the body of saline connate water which is a remnant of the inland sea.
b.Confined Fresh Water
12. (a) Above the connate water, and between it and the Corcoran clay, is a body of fresh water. When originally tapped, it was found to be under pressure, and there were many artesian wells. By 1920, however, the withdrawals of water from beneath the Corcoran clay had been sufficient to exhaust the pressure.
(b) The principal recharge of this body of confined fresh water has been and continues to be the flows of the San Joaquin River (below Friant) and of rivers and streams east of the San Joaquin River and north of Friant. Since the Corcoran clay is virtually impermeable, recharge waters reach the area of confined waters only by percolation outside the edges of the clay. Insofar as material to this action, the points of principal recharge, while numerous, are located many miles away from the lands in suit; and any recharge contributed by the San Joaquin River would be made in the vicinity of Fresno, and would be drawn into the Fresno pumps.
c.Unconfined Fresh Water
13.(a) The third body of water, known as unconfined ground water, lies on top of the Corcoran clay. It occupies the voids in permeable soils and extends, in depth, all the way from the top of the Corcoran clay to a distance of only a few feet beneath the surface of the earth.
*566 (b) The sources of the unconfined ground waters are per-colations from the flows of the rivers, from floodwaters, rainfall, and contributions from excess water applied for irrigation.
(c) In times of high flows in the liver, the water table developed a gradient moving from the river toward a level corresponding with the river’s stage. As the high flows subsided, the gradient was reversed, and the water table tended to drain back into the river or sloughs. In either case the movement was quite gradual, being at the rate of approximately 1 foot per day.[2]
14. Both bodies of fresh water, confined and unconfined, could be and were made available for irrigation and other uses by means of pumps. Ground water was therefore uniformly available throughout the area in suit to supplement the supply of surface flows in the river or, in many instances, for use in lieu of such surface flows.'
• m. APPROPRIATIVE, PRESCRIPTIVE,- AND RIPARIAN RIGHTS
A. Irrigation
1. The Beginnings of Irrigation
15. (a) Interferences with the natural flow of the river below Friant by manmade structures were begun in the 1870’s. One of the earliest was a dam at Mendota, hereinafter more fully described. Extensions of the diversions of the river’s flow continued, until there were developed many rights to water by appropriation and prescription.
(b) Miller & Lux, Incorporated,[3] a Nevada corporation doing business in California, and certain of its subsidiary and affiliated companies were, prior to the construction of the Central Valley project, the owners of rights to the use of a very substantial portion of the flow of the San Joaquin Elver.
(c) Prior to any of the times here involved, Miller & Lux had become the owner of large areas of land, beginning with a narrow strip at Gravelly Ford and extending in varying *567 widths down the San Joaqnin Valley to approximately the junction of the Merced River with the San Joaquin River. Large portions of the lands owned by Miller & Lux were riparian to the San Joaquin River, or to sloughs or branch channels thereof, and in some instances to both.
(d) Beginning about 1870 and continuing over a course of years, Miller & Lux and certain subsidiaries or affiliated companies constructed a series of control works along portions of the San Joaquin River and its sloughs. These physically changed to some extent the state of nature, so that as operated and maintained by Miller & Lux, the overflow from the river and from some of the sloughs was modified as to some of the land.
(e) Among the irrigation companies subsequently formed were the San Joaquin & Kings River Canal & Irrigation Company (whose rights were later acquired by the Central California Irrigation District, hereinafter CCID), Gravelly Ford Canal Company, Columbia Canal Company, Fire-baugh Canal Company (formerly Panoche Canal Company), and San Luis Canal Company. All were corporations.
(f) Prior to any of the times here involved, such corporations, with the consent of and under agreements with Miller & Lux, constructed certain canals and works and thereby diverted and appropriated large quantities of the water of the San Joaquin River for the irrigation (1) of lands riparian to the San Joaquin River owned by Miller & Lux, and (2) of lands nonriparian to the San Joaquin River owned (i) by Miller & Lux and (ii) by other persons.
(g) Also prior to any of the times here involved and in addition to the foregoing diversions, Miller & Lux constructed certain canals and works and thereby diverted and appropriated waters of the San Joaquin River for the irrigation of lands owned by it, both riparian and nonriparian to the San Joaquin River.
2. The Uses of Irrigation
16. (a) A large part of the water so diverted and appropriated by Miller & Lux and by the companies named in finding 15(e) was appropriated and diverted and was used for the irrigation of croplands. A large part also was di *568 verted and appropriated and was used for the purpose of irrigating grasslands or pasturelands through the medium and under the control of canals, ditch®, leve®, and other works. Such grasslands were referred to as controlled grasslands. Some of these lands, including portions of the lands of some of the plaintiffs, were riparian to the San Joaquin Elver or to sloughs or branch channels thereof. Miller & Lux applied water to those controlled grasslands only during periods when flows were in exc®s of the amounts that could be used beneficially on croplands.
(b) In addition to the croplands and controlled grasslands so irrigated, Miller & Lux owned lands of another character riparian to the San Joaquin Eiver, its branch® and sloughs. During the periods of spring and winter high water or floods, at times of normal or greater than normal flow, the waters of the San Joaquin Eiver flowed by and over and upon such grasslands by means of the main channel and branch channels and sloughs, and moistened such lands and provided water for cattle and other livestock. Lands so watered were referred to as uncontrolled grasslands.
(c) Th®e three categories of land use, croplands, controlled grasslands, and uncontrolled grasslands, have been prominent features in the adjustment of water rights during the course of and after construction of the Central Valley project. As herein described, and as considered in previous cases in this court, the irrigation of croplands and controlled grasslands, and the seasonal moistening of uncontrolled grasslands, were accomplished by the surface flow of the waters of the San J oaquin Eiver.
B. Interferences and Modifications
1. Electric Power Installations
17. During the period from 1895 to 1928, Southern California Edison Company and San J oaquin Light and Power Corporation, or their predec®sors, constructed dams and reservoirs in the San Joaquin Eiver Basin above Friant and stored water in the r®ervoirs and released and regulated the flow of the waters through a series of power plants. Beginning in 1906, Miller & Lux and its subsidiaries entered into numerous contracts with the two power companies or *569 their predecessors, by the terms of which it was agreed generally that, subject to certain limitations as to times and quantities, the two companies might store waters of the San Joaquin Biver system during comparatively high stages of the flow, use the stored water for the production of power, and return it to the river above the lands owned by Miller & Lux during lower stages of the flow.
The effect of such operations was to reduce the amount of the flow in periods of high water and to increase the amount of the flow during periods of low water. As new reservoirs were put into operation during these years, the regimen of the river below Friant was materially and progressively altered. The relative rights of the plaintiffs to the use of the waters of the San Joaquin Biver are limited to the flow of the river as altered by operations of the power companies under the agreements above mentioned.
2. The Haines Decrees
18. In the early 1920’s, Miller & Lux and two of its affiliated companies commenced three actions in the Superior Court of the State of California in and for the County of Fresno. In one of the actions, No. 25129, Miller & Lux, Incorporated, was plaintiff, and Madera Irrigation District and certain individuals were defendants. A decision, consisting of findings of fact and conclusions of law, was rendered in that case on January 4, 1933, and a decree was entered in accordance with such decision on January 26, 1933. In the second action, No. 25730, the San Joaquin & Kings Biver Canal & Irrigation Company, Incorporated (successor to San Joaquin & Kings Biver Canal & Irrigation Company), was plaintiff, and Madera Irrigation District and certain individuals were defendants. A decision was rendered in such action on January 4,1933, consisting of findings of fact and conclusions of law, and a decree was thereafter entered in accordance with such decision. In the third action, No. 25731, San Luis Canal Company, a corporation, was plaintiff, and Madera Irrigation District and certain individuals were defendants. A decision in this case was rendered December 31, 1932, and a decree was thereafter entered in accordance with such decision. These decisions and the decrees *570 entered upon them are referred to herein as the Haines decrees, so called because they were rendered by the Honorable Charles C. Haines, Judge of the Superior Court.
19. (a) The Haines decrees adjudicated that Miller & Lux and its affiliated companies had appropriated certain quantities of water for the irrigation of the land there involved, including cropland and controlled pastureland; that such diversion, appropriation, and use had continued adversely to all the world for more than 5 years; that Miller & Lux and its subsidiaries had acquired thereby a prescriptive right to the use of the water so appropriated; and that Miller & Lux and its subsidiaries were the owners by prescription and appropriation of the rights so defined in the decrees. These rights were expressed in terms of cubic feet per second,[4] but, except in two instances, with a limitation as to the total diversion in terms of acre-feet per year.[5]
(b) For a long time prior to the construction of the Central Valley project there existed a number of appropriative and prescriptive rights Which were entitled to be satisfied out of the waters of the San Joaquin Liver flowing past Friant. Some 'of these (1) were so entitled apart from agreement or covenants or reservations and conditions in deeds (including those hereinafter mentioned), and (2) were adjudged by the Haines decrees to be owned by Miller & Lux and certain other corporations; and some were owned by other diverters.
(c) All of the appropriations described in this finding were upstream from the lands of plaintiffs. The rights thereto were valid and subsisting as of the dates of the Haines decrees. There has been no change in their number or magnitude between the dates of the Haines decrees and the present. The appropriative and prescriptive rights described in this finding were entitled to receive, in the aggregate, a maximum annual flow of 1,428,074 acre-feet.
*571 3. Riparian Rights Above Gravelly Ford.
■ 20. Prior to the construction of the Central Valley project there were also lands irrigated by water taken from the San Joaquin River between Friant Dam and the head of the Gravelly Ford Slough. These rights were riparian rather than appropriative or prescriptive rights and amounted in the aggregate to 30,464 acre-feet per year.[6]
C. Discharges of the River
1. Volume of Flows
21. (a) Yearly discharges of the San Joaquin River at Friant varied widely in volume from the highest year, 1886, to the lowest, 1924. By 10-year periods (from 1897 to 1955), the average yearly discharge varied from a high of 2,210,044 acre-feet to a low of 1,286,200 acre-feet, with a mean for the six decades of 1,712,867 acre-feet. During each of such 10-year periods, the discharges for separate years varied widely. Actually, there were few years when the discharge was approximately that of the yearly average. In many years the excess over the yearly average was quite high, while in many years there was a deficiency. In some of the low years the discharge was less than the aggregate of maximum diversions to which all appropriators were entitled.
(b) The discharge is not uniform throughout a year, nor do the relative discharges for the months within the year remain constant. The highest monthly discharge during the year usually occurs in May or June, although occasionally it occurs in April. An average of monthly percentages based on 39 years (1905-1943) shows discharges of 21 percent in May, a like amount in June, and 13 percent in April, thereby accounting for 55 percent of the yearly discharge in these 3 months. For the crucial irrigation months of July, August, and September, the total shown by these averages was 18 percent (11 percent in July; 4.4 percent in August; and 2.6 percent in September).
*572 22. (a) As the flows actually occurred, there were times of the year when, as a matter of right, the owners of ap-propriative and prescriptive rights, without reaching or exceeding their maximum limits in cubic feet per second, diverted all of the water of the stream. At other times, the discharge exceeded the capacity of the diversion works of such appropriators and their requirements for use, as well as exceeding the maximum limit in cubic feet per second under their rights.
During the middle and latter part of the irrigation season, plaintiffs received only return water from the Miller & Lux operations, the quantity of which was dependent upon the water rights of Miller & Lux and the water taken by them. Outside of the irrigation season, some of the plaintiffs received the snowmelt floodwaters in the spring, of which there was an excess over all other water rights, sufficient for plaintiffs’ use.
The records of diversions show that there was a period in most years, usually commencing in October, November, or December, and ending the next summer, when there was an excess of water over the requirements of all appropriative and prescriptive rights. Generally, this period commenced just after the beginning of the winter rains, when the discharge of the river was relatively low, but the demand for water was even lower. The excess of supply over demand continued through the rising volume of discharge caused by the winter and snowmelt floods. It continued through the peak of the snowmelt floods and was cut off when the high discharges from the snowmelt floods began to subside.
(b) In order to achieve the most beneficial use of the water throughout the irrigation season, agreements were reached between the owners of several of the appropriative rights under which diversion or flow schedules were set up allocating the water in the river during each month by reference to the river stage at Friant. The principal agreement was executed on July 18, 1938, between Miller & Lux, the San Joaquin & Kings River Canal & Irrigation Company, the Edison Securities Company, and the Columbia, San Luis, and Firebaugh Canal Companies. The flow schedule contained in that *573 agreement was approved by the State Eailroad Commission and has been in use since that time.
This flow schedule was later expanded to include the several grassland rights as determined and limited by the Haines decrees. Grassland rights is the term generally used to describe the appropriative and prescriptive rights owned by Miller & Lux and its subsidiary companies and used by them for the irrigation of controlled grasslands as distinguished from croplands.
2. Upstream Diversions
23. (a) The diversions by Miller & Lux and its affiliated companies mentioned above were all upstream from the lands of plaintiffs. The greater part of the water so diverted was diverted 'by means of two dams across the San Joaquin River.
(b) Mendota Dam was originally built in 1871 by the San J oaquin & Kings River Canal & Irrigation Company, under contract with Miller & Lux, for the purpose of diverting San J oaquin water into several large canals heading immediately above the dam, and has been progressively maintained, improved, and replaced by the San Joaquin & Kings River Canal & Irrigation Company (now CCID) ever since. It was not built for and is not used for storage purposes. As an incident to raising the level of the water for the purpose of diversion, a certain amount of channel storage resulted. The amount of water thus stored was never more than a relatively negligible amount, and it was not utilized as stored water, or for any purpose other than maintaining the level necessary for diversion. Diversions were also made by Miller & Lux through other canals and sloughs.
(c) Sack Dam, located about 19 miles downstream from Mendota, was not a permanent structure. It was reconstructed each year, most often in mid-July, sometimes earlier and sometimes later, whenever the flow of the river dropped below an amount equal to or less than the requirements of the croplands irrigated by the canal companies. The dam remained in place until the major portion of the irrigation season had passed, at which time it was removed, usually in October, November, or December. During the period when the dam was installed, there was virtually no direct surface flow in the river immediately below the place of installation.
*574 (d) The records of water actually diverted show that Miller & Lux and its affiliated companies did not divert and put to use in any one year as much water as the 1,428,074 acre-feet authorized by the appropriative and prescriptive rights described in finding 19(c). The maximum yearly diversion during this period was 1,027,180 acre-feet in the year 1932, and the average diversion over the 20-year period, 1932-1951, was 870,834 acre-feet.
3. Summary
24. (a) The following statements are by way of summary of the facts set forth in findings 15-23 above.
(b) The Haines decrees adjudicated that Miller & Lux and its affiliated companies had appropriated certain quantities of water for the irrigation of the land there involved, including cropland and controlled grassland. Such diversion, appropriation, and use had continued adversely to all the world for more than 5 years. Miller & Lux and its subsidiaries had acquired thereby the prescriptive right to the use of the water so appropriated and were the owners by prescription and appropriation of the rights defined in the Haines decrees. Those decrees authorized a diversion by Miller & Lux, as against the Madera Irrigation District, et ah, of a maximum quantity of 1,428,074 acre-feet a year under certain circumstances.
(c) The highest annual diversion ever made by Miller & Lux thereafter was 1,027,180 acre-feet, and its annual average diversion from 1932 to 1951 was 870,834 acre-feet. The yearly discharge of the San Joaquin River at Friant, which included floods, exceeded 3 million acre-feet in the years 1911 and 1938. By 10-year periods from 1897 to 1955, the average yearly discharge, which included floods, varied from a high of 2,210,044 acre-feet to a low of 1,286,200 acre-feet, with a mean for the six decades of 1,712,867 acre-feet. Miller & Lux was therefore the owner of rights to the use of a very substantial portion of the flow of the river; but while the flow varied widely from year to year, during flood stages it usually exceeded the volume of the maximum possible demand. Consequently, during’ flood stages, there was usually some excess'over the water the prior appropria *575 tors had any right to demand, and almost always an excess over the actual use of the prior appropriators.
(d) Miller & Unix and its subsidiaries utilized such parts of the high waters and floodwaters as they could control by delivering them through canals to the lands referred to as controlled grasslands. The remaining part of the flood-waters flowed out over the flood plains of the river, elsewhere referred to as the Santa Eita Mood Plain, and eventually made its way back into the river and flowed downstream.
IV. THE RETURN ELOW 0E IRRIGATION WATER
A. Sources of Return Flow
25. Water used in the irrigation of croplands is not wholly consumed in the irrigation process. Part of the portion not consumed is lost in evaporation; part washes down and contributes to the ground water; and part reappears in the sloughs and in the river, downstream from the irrigated land, and is known as return flow. This return flow derives principally from three sources:
(1) Of the water that is actually applied to the land to be irrigated, a portion is lost in evaporation; a portion is con-sumptively used by the crops; and another portion seeps through the soil. It is neither possible nor desirable to apply exactly the amount of water needed to wet the earth no farther than the bottom of the root zone. In order to insure that the crops have enough water, more than is needed for plant consumption and evaporation allowance must be applied, and the excess percolates down until it reaches the top of the ground water table. The ground water table in this area is very close to the surface. When the ground water encounters sloughs or drains that are below the top of the water table, the water drains into these channels, thereby reappearing as surface water and as one element of the return flow.
(2) A second element of the return flow consists of what is sometimes referred to as tail water drainage of the irrigated cropland. Apart from the fact that more water must be allowed to percolate through the soil than is needed for the consumptive use of crops, it is also not possible to divert *576 onto the higher end of the field that is to be irrigated so precise an amount of water as to leave no surplus available at the lower end of the field, over and above the water that percolates into the soil. This surplus must be drained off if the crops at the lower end of the field are not to be damaged. It is occasionally thereafter reapplied in ordinary irrigation which greatly reduces the quantity and quality of the tail waters. It is carried off through the drains and ultimately finds its way into the sloughs and into the river downstream of the irrigated land.
(8) Finally, in the operation of a large distribution system it is not possible to schedule the deliveries of water to the various owners of irrigated land who are served by the canal with such precision that the entire amount diverted from the stream is always fully used; or, stated another way, so that there is never flowing in the canal, at or about the downstream end of its service area, an amount of water sufficient to supply only those lands in that area and no more. There must always be some surplus. These surplus waters are referred to as the operational spill of the canal system. They are allowed to drain off and constitute the third element in the return flow.
B. The Irrigation Efficiency
26. (a) The ratio between the amount of water actually used by the crop and the amount of water that is applied to the lands to be irrigated is known as the irrigation efficiency. An excellent irrigation efficiency would be of the order of 70 percent. In the area of the San Joaquin Valley with which this case is concerned, the irrigation efficiency is something less than 70 percent; possibly as low as 50 percent. Thus, between 30 and 50 percent of the water that is applied to the land is not consumed by the crops to which it is applied.
(b) Not only is a 100 percent irrigation efficiency impossible of fulfillment as a practical matter, but it would, if achieved, constitute a destructive irrigation practice. All of the water used for irrigation purposes contains a certain percentage of salts. It is desirable, if not necessary, to maintain what is termed the salt balance of the area. This means, broadly speaking, that the total amount of salts brought into *577 an area that is being irrigated must be compensated by the amount of salts taken out of the area. If it were possible to reuse and recirculate irrigation waters so that there was practically no return flow, this would necessarily result in a gradual buildup of the salts in the area, a condition which would ultimately decrease production and possibly even destroy the land. One expert witness testified that the ancient civilizations of the Tigris and Euphrates Valley perished as a result of such destruction of the productivity of their lands.
V. THE CENTRAL VALLEY PROJECT
A. The Plan
¡27. The plan for the utilization of the waters of the San Joaquin and Sacramento Elvers, as formulated by defendant, involved the irrigation of a large area of privately owned land nonriparian to the San Joaquin Eiver, situated both to the north and south of Friant in the California counties of Madera, Merced, Fresno, Tulare, Kings, and Kern. The plan contemplated, among other things, the construction of a dam across the San Joaquin Eiver at Friant, forming a reservoir. It contemplated the construction of two canals, one with a capacity of 1,000 cubic feet per second, referred to later as the Madera Canal, running north from the reservoir to the county of Madera, and another with a capacity of 3,500 cubic feet per second, referred to later as the Friant-Kem Canal, reaching south from the reservoir to the counties of Fresno, Tulare, Kings, and Kern. Except for occasional spills to provide reserve storage capacity for the purpose of flood control, the reservoir and canals were planned with capacity to store and divert substantially all the water customarily flowing in the San Joaquin Eiver at Friant. Details of the plan were set forth in a letter dated November 26, 1935, addressed to the President by the Secretary of the Interior. The President approved the plan on December 2, 1935, and thus authorized procedure under the Reclamation Act, 32 Stat. 388. Cf. Rank v. Krug, 142 F. Supp. 1, 96 (1956). All of the plan and its modification was public information at all times involved herein and was known to prospective purchasers of lands involved herein or could have been studied by them by 1950 or prior thereto.
*578 28. The plan has been altered in a number of respects since it was approved by the President. Among other things, the height of the Friant Dam was increased from 250 feet to 320 feet, enlarging the storage capacity from 400,000 acre-feet to 520,000 acre-feet. The proposed pumping system which would have conveyed Sacramento River water up the bed of the San Joaquin River by means of natural and artificial channels and works in a series ending at the mouth of the Merced River, has been supplanted by another which pumps Sacramento-San Joaquin Delta River water from the delta into the Delta-Mendota Canal, to be carried thence by gravity south to Mendota. The capacity of the Friant-Kem Canal has been increased from 3,500 to 4,000 cubic feet per second.
Due primarily to the exigencies of the Second World. War, substantial portions of the project were not completed on schedule, but, with some modification, defendant’s original plan has continued as the plan of defendant, and has been carried out by the construction of the Friant and Shasta Dams, the canals known as Madera, Friant-Kern, and Delta-Mendota, and other features. Congress has appropriated large sums of money to finance the work.
29. (a) Defendant’s plan, as modified, contemplated that the United States should eventually store and divert to non-riparian use the waters of the San Joaquin River originating above Friant Dam and formerly flowing at or below Gravelly Ford, except for releases from Friant which would be for one or more of three purposes: (1) to satisfy riparian rights between Friant and Gravelly Ford; (2) to reserve vacant storage space in the reservoir in the exercise of flood control; and (3) to supply, when available, water to meet the requirements of the contract for exchange of waters referred to in finding 31, infra. The exchange waters are primarily supplied through the Delta-Mendota Canal. In normal, contemplated operation, releases for purposes (2) and (3) above would not provide an adequate or a dependable source of water to fulfill the exchange contract or for the irrigation of riparian land below Gravelly Ford.
(b) The plan contemplated that defendant should acquire or provide and maintain a substitute supply for all existing rights to the use of San Joaquin water originating above *579 Friant Dam and formerly flowing at or below Gravelly Ford. Such rights were of three classes: (1) use of the water for production of cultivated crops; (2) use of the water for irrigation of controlled grasslands under appro-priative or riparian rights; and (3) the riparian right to the flow of the river for the irrigation of other riparian lands, watering of livestock, and domestic purposes.
(c) Defendant’s plan contemplated that compensation for the acquisition of the right to the use of water on croplands at or below Mendota Dam to approximately the mouth of the Merced River would be made by providing a substitute supply of water from the Sacramento River through the pumping system. Pending the construction and completion of the pumping system, the plan contemplated that sufficient water would be released from the Friant Reservoir to meet the requirements of the cropland rights.
The plan contemplated that the rights of the second and third classes enumerated in paragraph (b) above were to be purchased or otherwise acquired by the defendant.
B. Purchase of the Right's of Miller & Lux and Others
30. (a) Promptly after the approval of its plan (in December 1935), defendant proceeded to ascertain the extent of the water rights to be purchased and the compensation to be paid therefor, and for that purpose an appraisal board was appointed. Attorneys for the United States Reclamation Bureau instructed the board as to the extent of such water rights. The water rights were considered in terms of two categories: (1) the water supply under rights for the irrigation of croplands; and (2) the water supply under appropria-tive, prescriptive, and riparian rights not used for the irrigation of croplands. The latter category included the appropriative and prescriptive, as well as the riparian rights, used for the irrigation of controlled grasslands, and the riparian rights Which benefited the uncontrolled grasslands.
(b) On July 27, 1939, Miller & Lux and its subsidiaries entered into a contract whereby Miller & Lux and its subsidiaries agreed to relinquish or convey to defendant for the sum of $2,450,000 all their rights to the use of the water of the San Joaquin River not used for the irrigation of crop *580 lands. Thereafter Miller & Lux and Gravelly Ford Canal Company executed and delivered to defendant a conveyance of the rights described in the agreement dated July 27,1989, being rights appropriative and riparian in origin for water not used for the irrigation of croplands.
(c) Defendant also negotiated with other owners of ap-propriative and riparian rights in the San Joaquin Yalley to acquire the water that those owners had the right to use. In some cases these negotiations resulted in settlements by which a supply of substitute Sacramento-San Joaquin Delta water was made available to the owners of these rights. Other owners filed suit in the Court of Claims and some were awarded damages for the loss of their rights to the use of water occasioned by the construction of the Central Valley project.
C. The Agreement for the Exchange of Waters
31. (a) On the same day, July 27,1939, Miller & Lux and its subsidiaries and defendant entered into a further agreement, referred to as the contract for exchange of waters. This agreement provided in detail (1) for the release of water from Friant Dam and (2) for the delivery of substitute water through the Delta-Mendota Canal when that system would became operative. It provided for a 'guaranteed flow of water of a specified quantity and purity to be delivered at Mendota Pool and granted the defendant the right to “store, divert, dispose of and otherwise use, within and without the watershed of the San Joaquin Diver, the aforesaid reserved waters” so long as substitute water was delivered in conformity with the contract.
(b) The volume of water, in terms of yearly aggregate, reserved by Miller & Lux in the exchange water contract of 1939, has been computed to be 1,056,340 acre-feet.
(c) Under date of June 1, 1955, the water exchange contract of July 27, 1939, was superseded by an amended exchange contract which, among other things, increased the quantity of water guaranteed to Miller & Lux and also increased the allowable percentage of salinity of the substitute water to be supplied by defendant by the Delta-Mendota Canal.
*581 1. Substitute Waters
32. Prior to the completion of the Delta-Mendota Canal, the lands in suit received return flows from irrigation water having the San J oaquin Biver as its source. After the completion of the Delta-Mendota Canal, the quantity of irrigation return water flowing in the channels of the San J oaquin Biver opposite plaintiffs’ lands was not diminished by the operation of the canal, but it consisted in ordinary and dry years of water from the Sacramento-San Joaquin Delta. Thus, the lands in suit were not wholly deprived, by the operation of Friant Dam, of return water originating in the upper San Joaquin Biver and used by Miller & Lux in their irrigation operations on their croplands until July 1953, when the completion of the Delta-Mendota Canal made possible the substitution of Delta water from that canal for upper San Joaquin water. The supply of Delta water was more reliable during crop seasons than had been the supply of San Joaquin water dependent upon the natural flow of the river.
33. The supply of substitute water guaranteed to Miller & Lux and its affiliated companies under the exchange contract is more stable than the supply which they enjoyed prior to the construction of the Central Valley project. Prior to the construction of the project, the yield of the water rights of the four affiliated companies in the month of August, one of the critical months of the irrigation season, varied from 11,400 acre-feet in the driest year of record to 118,500 acre-feet in the wettest year of record. The median amount was about 69,000 acre-feet. The original exchange contract guaranteed delivery of such quantity of water as the canal companies would have had in the absence of the operation of the Central Valley project, but with provision for a minimum amount of 93,000 acre-feet of water. Under the provisions of the amended contract, the minimum supply guaranteed in the month of August was increased to 126,000 acre-feet except in the case of very dry years.
D. Construction of Works and Impounding of Water
34. Friant Dam is a straight gravity concrete dam. Its total length at the top is 3,430 feet, and the maximum height *582 is 320 feet. Across the top of the dam is a roadway whose elevation above mean sea level is 583 feet.
The only openings extending entirely through the dam are those hereinafter mentioned. The first is the spillway at the top of the dam which is controlled by three drum gates. These drum gates are large steel cylinders, each 100 feet long and 18 feet in diameter, which float up and down in a chamber at the' bottom of the spillway opening and which are raised and lowered by the water let into and released from the chamber. By increasing the amount of water in a chamber, each gate floats up, closing to the extent desired the opening which the particular gate is to control. By reversing the process, the gate goes down. It can be adjusted and held to any point. When the gates are raised to the designed maximum elevation, the maximum water surface is at elevation '578. When the gates are completely lowered, the maximum water surface is at elevation 560, except for the head required to flow the water over the spillway. The drum gates were intended to be installed in 1942, but due to the advent of war in 1941, progress in that connection was halted. They were installed on October 31,1947.
The outlet to the Friant-Kern Canal at the south side of the dam is at elevation 464.
The outlet to the Madera Canal at the north side of the dam is at elevation 446.
The normal low-water surface of the river prior to the construction of the dam was at elevation 305.6.
35. The contract for the construction of the dam was awarded on October 9, 1939, and construction was commenced on November 3, 1939. In the early stages of construction, the water of the river was carried over the foundation of the dam in a wooden flume.
By October 20, 1941, the concrete work in the dam had been completed to a point above elevation 400, but not as high as the elevation of the designed outlet into the Madera Canal. On or about that day, the gates in the temporary outlet were partially closed for the purpose of impounding water and at the same time allowing the passage of approximately the amount of water required to be released under the agreement of July 27, 1939, with Miller & Lux and its *583 subsidiaries. This operation raised the surface of the water in the reservoir until, on November 11, 1941, the water reached elevation 375.42 and commenced to spill through the permanent river outlets.
The water was then cut off from the temporary outlet, and the work of permanently sealing that outlet was begun. The sealing was completed in about 5 months. Except for the amount approximately equaling the quantities reserved by Miller & Lux and its subsidiaries, no water passed the dam between October 20 and November 11,1941.
When the water was cut off from the last temporary opening and the opening was sealed, the water below the inverts of the permanent river openings was permanently impounded, with no means left for its release. The amount so impounded was approximately 17,400 acre-feet.
36.- The permanent river outlets were designed to be controlled by needle valves. Defendant had been taking steps ■preliminary to the purchase of the valves when, in the fall of 1941, the international situation became so bad, and demands for materials for defense purposes became so great, that the valves could not be obtained. Except for the emergency and for the ensuing war, the valves to control the permanent river outlets would have been installed in the year 1942.
In the fall of 1941, the Madera Canal had been constructed to the extent of about 7 miles, but had not yet been completed. Construction of the Friant-Kem Canal had not been commenced.
For a short time in the winter of 1942, a high flow in the river caused more water to enter the reservoir than could be drained by the uncontrolled permanent river outlets, and water was temporarily impounded to elevation 415. As the flow of the river dropped, the water impounded above the elevation of the permanent outlets drained through the uncontrolled permanent outlets into the river below the dam.
In 1943, needle valves for two of the four permanent river outlets and for the Madera Canal outlet were borrowed from Boulder Dam and were installed. The first storage of water in the reservoir by means of closing or partially *584 closing one of these valves was started on February 21, 1944.
37.The Madera Canal was at least partially completed in 1944. The surface level of tbe water in the reservoir was then raised sufficiently to divert a large quantity thereof through the Madera Canal, from which it was used to raise the general water table in the area served by the canal. Approximately 302,500 acre-feet of water was stored behind the dam at this stage of the operation. The flow of water through the dam was never completely stopped. For the 6 months after the needle valves were installed, the quantity of water released monthly was approximately that required under the agreement of July 27,1939, between the defendant and Miller & Lux and its subsidiaries. During and after September 1944, the releases were substantially larger than the requirements of such contract, except during the months of November and December 1944, when they were substantially equal to such requirements.
In 1945, by means of controls at permanent river outlets, the reservoir was filled to the base of the openings for the drum gates of the dam, creating storage of approximately 430,000 acre-feet of water. The installation of drum gates in the spillway section of the dam was completed approximately in August 1947, and these gates were first operated to impound water during the period from June 16, 1948, to July 13,1948, when the elevation of the surface of the water in the reservoir rose to 8.13 feet above the base of the opening of the drum gates.
E. Operation of Canals
38. Partial operation of the Friant-Kem Canal was commenced on July 9, 1949. Some deliveries of water from the reservoir through the canal for irrigation purposes were made after that date. The canal was not -ready for full operation until March of 1950.
39. The initial features of the Delta-Mendota Canal were completed in August 1951, making possible the first integrated operation of the Central Valley project. Thereafter the flow of the San Joaquin River was gradually diverted from its course below Friant and turned into the Friant- *585 Kern Canal in increasing amounts. The flow into the Madera Canal continued as before. By July 1958, the San Joaquin River was being substantially diverted, wherefore the flows of San J oaquin water reaching the lands of plaintiffs consisted of (1) floodwaters, averaging once in 4 years, and (2) releases from Friant Dam to provide storage space for flood control. Since the Delta-Mendota Canal was placed in full operation, any substantial quantity of water passing plaintiffs’ lands derives from sources other than the Ban Joaquin River except in times of extraordinary flood.
40. The monthly flows of the San Joaquin River at Friant into the Madera Canal, the Friant-Kern Canal, and the San Joaquin riverbed below Friant, for the years 1941 through 1953, are shown in tables I through VII. The diversions and ■streamflow of the San Joaquin River between Friant Dam io and including Fremont Ford, plus the flow of Mud Slough for the years 1946,1947, and 1948 are shown on tables VIII, IX, and X. Table XI shows the percentage of the 60-year normal or average annual flow of the river below Friant. Tables I through XI are incorporated herein by reference.[7]
41. (a) Prior to the completion of the Delta-Mendota ■Canal, releases of water from Friant Dam were made to fulfill the requirements of the agreement between defendant and Miller & Lux, looking to the ultimate exchange of waters. The exchange of waters was begun in August 1951, whereupon the diversions of San Joaquin water at Friant were gradually increased until the exchange of waters was made -complete in July 1953. Thereafter, releases of water from Friant Dam to meet the requirements of Miller & Lux below Mendota Pool ceased.
(b) Releases of water from Friant Dam were and are made to provide room for flood control storage. Since the -construction of Friant Dam, there has been a flood in the San J oaquin River on an average of 1 year out of 4. The amount, height, and duration of the flow of floodwaters of the San Joaquin River below Friant have been materially reduced by the operation of the dam.
(c) The supply of substitute water guaranteed to Miller -& Lux and its affiliated companies under the exchange con *586 tract is not as great each year as was the full natural flow, including floods of the San Joaquin River before Friant Dam was constructed. The supply during the later portion of the irrigation season is larger and more reliable than was to be expected of the natural flow of the San Joaquin River.
(d) The lands in suit were not wholly deprived, by the operation of Friant Dam, of San Joaquin water in the return flow from Miller & Lux irrigation operations until July 1953, when the completion of the Delta-Mendota Canal made possible the full substitution of Delta water for San Joaquin water to supply Mendota Pool. Prior to the completion of the Delta-Mendota Canal, the lands in suit received return flows from irrigation water having the San Joaquin River as all or some of its source. After the completion of the Delta-Mendota Canal, the irrigation return water flowing in the San Joaquin River opposite plaintiffs’ lands consisted in ordinary and dry years of water originating in the Sacramento-San Joaquin Delta. This supply of water was more reliable during the latter portion of the crop seasons than had been the supply from the natural flow of the San Joaquin River.
F. Recapitulation
42. The following dates represent significant milestones in the construction and operation of Friant Dam and the canals which are material to this action.
(1) February 21, 1944, representing the beginning of the operation of controls at the Friant Dam.
(2) June-July 1948, representing completion of controls at Friant Dam and the beginning of their contemplated operation for the control of floods. After midsummer 1948, the regimen of the river in terms of floodwaters and flows in the high channels was completely altered.
(3) July 9, 1949, representing the beginning of partial operation of the Friant-Kern Canal.
(4) March 14, 1950, representing the readiness for full operation of the Friant-Kern Canal.
(5) August 1951, representing the beginning of partial operation of the Delta-Mendota Canal.
*587 (6) July 1953, representing the beginning of complete operation of the Friant-Kem and the Delta-Mendota Canals.
(7) June 1, 1955, the date when the water exchange contract of 1939 was superseded by an amended agreement which increased (i) the quantity of water guaranteed to Miller & Lux and (ii) the allowable percentage of salinity of the substitute waters.
TI. THB ACTION
A. Filing — Trial
1.Relevant Dates
43. (a) The petition in the present case was filed on March 10, 1955. The 6-year statute of limitations, if applicable, bars claims originating prior to March 10, 1949.
(b) Trial was held in California in October 1961.[8]
2.Gravamen of the Complaint
44. The petition contains 19 counts[9] wherein 27 claimants seek just compensation for the taking of water rights affecting 35 parcels of land containing more than 20,000 acres. The claimants assert that their water rights and water have been taken; that the quantity and quality of water available for use in irrigating their lands have been degraded and diminished ; and that the value of their lands has been reduced— all because of the construction and operation of the Central Valley project by defendant, particularly that portion of the project which includes Friant Dam on the San Joaquin River, and the introduction of other (substitute) water into the riverbed by the Delta-Mendota Canal.
3.Identity of the Plaintiffs
45. The petition lists as plaintiffs one corporation and 26 individuals. The corporation is the single claimant in the *588 first count of the petition. Ten other counts are devoted to the claims of each of 10 individuals. In the remaining 8 (of the 19) counts, 2 or more individuals are named as claimants, including, in 3 instances, 1 or more of the 10 claimants named in separate, individual counts. This arrangement accounts for the listing of 36 names in the caption of the petition.
4. The Lands
a. Location
46. (a) All of the lands in suit lie on the west side of the San Joaquin River between the towns of Ingomar on the south and Westley on the north, in the California counties of Merced and Stanislaus, and within the exterior boundaries (or the northern or downstream end thereof) of the so-called Santa Rita Flood Plain of the San Joaquin River.
(b) Of the total area of 20,051.59 acres, 77 percent (15,445.84 acres[10]) lies upstream from the junction of the Merced River with the San Joaquin.
(c) Of the remaining 4,605.75 acres, another Freitas tract of 937.42 acres lies at the mouth of the Merced River. The other 3,668.33 acres are downstream from the junction of the Merced and the San Joaquin.
(d) Above and below the mouth of the Merced River, the lands in the various tracts lie almost side by side, or end on end, for a distance of some 20 miles, except for the lands in Count 1, which are south and west of the other tracts, and the 1,641.80 acres in Counts 3, 4, 15, and 16, which are 10 to 12 miles downstream from (north of) the north end of the string of other lands.. There is thus involved a stretch of the river of some 30 to 35 (air) miles.
b. Uses
47. On March 14,1950 (the date on which plaintiffs claim the taking occurred, a contention explained hereinafter), the lands upstream (on the San Joaquin) from the mouth of the Merced (containing 15,445.84 acres) were all in native *589 pasture. The other 937.42 acres of Freitas land were either in native pasture or. used for dry farming. ■ The remaining 3,688.33 acres were, with minor exceptions, developed for irrigated row crop culture.
5. Parcels of Land[11]
48. (a) Each count of the petition as amended contains the legal description of the parcel or parcels of land owned by the plaintiff or plaintiffs named in the count. The ownership is not disputed.[12]
(b) Table XII[13] presents a tabulation, by counts, of the number of plaintiffs named and parcels described, together with the number of acres in each parcel, and reference by page, paragraph, and line of the petition where the legal description may be found. The accuracy of the legal descriptions is not disputed.
B. Prior Litigation
1. Gerlach and Belated Cases
49. (a) In 1948, the Court of Claims in three decisions disposed of eight cases involving alleged interferences with water rights along the San Joaquin Eiver resulting from the construction of Friant Dam.[14]
*590 (b) The claimants in Gerlach, Potter, and Erreea, sole, were held entitled to recover for loss of the floodwaters which had moistened their grasslands. The taking was said to have been complete not later than October 20,1941. The diminution in value was found to 'be $9 per acre.[15]
(c) The lands of the claimants in Gerlach, Potter, and Erreea, sole, are in the Santa Rita Flood Plain, just across the river from the bulk of the lands of the plaintiffs in the instant case.[16]
2. The Wolfsen Case
50. (a) The case of Wolfsen v. United States[17] was decided in 1958. The lands of those claimants are on the west side of the San Joaquin River, immediately upstream from the bulk of the lands of the plaintiffs in the instant case.
(b) The petition in Wolfsen was filed on March 22,1955.[18] The claimants made no demand for loss of floodwaters.[19] They based their claims upon the alleged deprivation of riparian rights in Salt Slough, contending that the substitution of waters at Mendota Pool resulted in the introduction of foreign waters into Salt Slough in lieu of the waters of the San Joaquin River, in which they had riparian rights.
(c) The court denied recovery, saying:[20]
* * * Plaintiffs are not entitled to compensation for a legal technicality. They must first show that something of substance has been taken from them. * * *
* * * There is no actual damage as a result of the deprivation of the San Joaquin waters and the substitution of the Sacramento waters. * * *
*591 C. Plaintiffs’ Theory of Their Case
1. Comprehensive Coverage
51. (a) With the Wolfsen decision before them, plaintiffs in the instant case have avowedly undertaken to prove actual damage — that something of substance has been taken from them — as a result of the substitution of waters. The basis of this claim is an alleged increase in the salinity of the waters available to them, surface and subsurface, since the curtailment of the flows of the San Joaquin Eiver and particularly since the exchange of waters was begun in August 1951. They contend that the increase in salinity of the water was caused by the curtailment of the flows of the San Joaquin Eiver and intensified by the exchange; that the more saline water is harmful to the salt-sensitive plants formerly grown on their lands, necessitating a change to salt-tolerant crops; that the presence of more saline waters imposes upon them an increased cost of leaching; and that the more saline waters are slowly degrading their soils with increasing salinity. They further contend that, in addition to the degradation of the quality of the water, there has been a diminution in the quantity of water available to them.
(b) In addition to the claim for degradation of quality and diminution in quantity of irrigation water, plaintiffs assert their right to recover for loss of floodwaters formerly used to moisten native pasture and for loss of flows in the high and low channels, which flows formerly were used for recreation — boating and fishing.
2. The Summary by Plaintiffs’ Counsel
52. At the trial of this action, upon completion of plaintiffs’ prima facie case, one of their attorneys gave the following summary of their theory of the case.
That concludes our witnesses, but before the Court adjourns may I make a short further response to your remark about the six-year period referring to annual floods ?
The Dickinson case dates the date of the taking for the purpose of eminent domain with the completion of the project. There had been several floods — that was a flowage case, and the Court went back to the date when *592 the damage became complete to sustain the claim under the statute of limitations.
Now, this is-not a tort action, not an action for damages against the Government. It’s a suit [for] inverse condemnation and would be judged the same as if the Government were seeking to condemn the land, and there is only one cause of action for a condemnation. In other words, all the damages are accrued — rare determined and the case is completed as of one time. Since there is only one cause of action, you cannot split up the cause of action into different segments and say that the statutes of limitation run separately as to different sections of it; such as the date of suppression to the annual floods as one segment, or the date of development of the salinity of the water as another segment. It is one cause of action and it is a cause of action that is found in time and all the segments are in time. For that we rely on the Dickinson, and also on the Slattery case, as I mentioned a short time ago, 231 F. 2d 37, in which the Court held that once the date of taking is fixed you can consider how much the value was impaired for some years before the taking. In that case the Court was speaking of the knowledge that the burden was going to bo imposed, but it went back much further than the six-year period to include detriments to the market value of the land.
In other words, once you have fixed the date of taking, then you can go back more than six years to determine the different items that have affected the loss of value of the land. That was quoting from 18 American Jurisprudence 890; quoted m another, Circuit of Appeals case 218 F. 2d 518,523.
Well, in the present case Friant Dam was physically completed late in 1947 but there was no place to put the water outside of the Madera canal, so the water continued to run down the river. The Friant-Kern canal was open for partial operation July 9, 1949, and from that time on more and more of the water of the San Joaquin Diver was diverted from the bed of the river and turned into the Friant-Kern canal to irrigate new lands down towards Bakersfield, but they couldn’t do very much until they got the Delta-Mendota canal ready to replace San Joaquin water, and that was put in partial operation August 1, 1951, and substantially in full operation July 19,1953. All this is well in the six-year period. The six-y.ear period started to run March 10, 1949.
So, our position is that — -rather, we have assumed as the date of taking March 1950, when the Friant-Kern *593 canal became ready for full operation.
There are several dates we could have taken under that period under the Dickinson case. It is not, of course, the first date of any transaction affecting the value; according to the Dickinson case it is a date of the last event which affects the value. So that is the reason why we independently have the date when the ordinary annual floods ceased. We.say that since our suit was filed, six years after March 10,1949, all of these items of diversion of water occurred after that date, and since there is only one- cause of action, the action will include all of the earlier items which help to complete it;, the final completion being .1953 when the last of the San Joaquin water was taken out of the San Joaquin riverbed and turned into the Friant-Kern canal.
3. Flexible Coverall
53. (a) By selecting as the date of taking March 14,1950 (the date when the Friant-Kem Canal was ready for full operation), plaintiffs'would, in effect, toll the statute of limitations in relation to the loss of floodwaters and flows in the high channel by means of the “final account” doctrine of the Dickinson case.[21]
(b) Instead of selecting two dates as dates of taking, one to toll the statute of limitations for claims which might otherwise be barred (such as the floodwaters, which were cut off in 1941), and another for claims which actually developed later (such as the degradation of irrigation water by the substitution which began in 1951), plaintiffs adhere to the one date (March 14, 1950) as the crucial date of taking in all of the claims. Such adherence affects the development of their case in two respects, one theoretical and one practical.
*594 (c) The uniform adherence to one date of taking (for all of the claims in all of the 19 counts) lends consistency to plaintiffs’ theory that the “burden” of which they complain as having been imposed upon them is not the construction or operation of the Friant Dam, as such, nor the construction or operation of the Delta-Mendota Canal, as such, but the Central Valley project as a whole. They would thus blur the distinctions between deprivations of floodwater and high water and the degradation through increased salinity of exchange water, by substituting therefor the project as a whole as the foundation of valuation evidence “without the burden” and “with the burden.” [22]
4. Valuation Evidence
¡54. (a) The practical effects of adhering to the one date of taking, with the concomitant necessity of establishing valuations before and after March 14, 1950 (as if the project had never been built, and with the project in place), are threefold.
(b) At the outset, there is the element of certainty. As plaintiffs admit in their brief to the commissioner:[23]
* * * It would, of course, be difficult, if not impossible, to find evidence of sales of comparable lands without the burden at the time of taking, i.e., the value in 1950 if Friant Dam and the Delta-Mendota Canal had not been built.
To overcome this difficulty, plaintiffs assert that:[24]
The value of plaintiffs’ land in March 1950, if the dam and canals had not been built, i.e., without the burden of defendant’s taking, can be established by estimate or opinion of persons informed on real estate values in the area involved * * *.[25]
Plaintiffs did just this. Their appraiser, following instructions, arrived at valuations as of March 14, 1950, as *595 if the Central Valley project had never been built. These valuations were, of course, based upon estimates without foundation on comparable sales. The estimates were made in 1961. The appraiser also arrived, in 1961, at valuations as of March 14, 1950, accepting the fact of the Central Valley project in its 1950 stage of development. These valuations were based, in part, on comparable sales. The difference between the values so determined, before and after, represented the appraiser’s opinion of the diminution in market value because of “the burden of the servitude,” i.e., the Central Valley project.
(c) A second practical effect of the selection of March 14, 1950, as the date of the taking, appears in relation to those claims which are predicated primarily upon the loss of flood-waters and flows in the high channel. These are the claims for diminution in value of lands devoted to native pasture and lands said to have potential value as campsites, for recreation (boating and fishing).
Insofar as Gerlach and related cases are any guide, such diminution (if any) must have begun as early as October 1941, being 814 years before claimants in the instant case would strike a balance and make a final accounting under the DioMnson doctrine. Moreover, the appraiser had to go back II14 years from October 1961 to strike the balance.
(d) The third practical effect of the selection of March 14, 1950, as the date of taking, appears in relation to those claims which are predicated primarily upon the alleged degradation of quality and diminution of quantity of irrigation water. Here the difficulties are at the other end of the spectrum from the claims relating primarily to the loss of heavier flows in the river. The appraiser had to assume that a willing purchaser, well informed in March 1950, would foresee the salinity problem of 1961 and discount his offering price accordingly.
VH. PREDICATES OE ELAINTIEES’ RIGHTS
A. Plaintiffs and the Haines Decrees
/55. The plaintiffs herein do not dispute the correctness or challenge the validity of the Haines decrees as against the defendants in the cases wherein the decrees were entered. On *596 the other hand, they do not admit that the water rights possessed by Miller & Lux in Í9B9 could be the subject of valid transfer, or that the Government acquired any water rights by the 1989 agreement with and conveyance by Miller & Lux and its subsidiaries, as against, any of the plaintiffs herein. The plaintiffs were not parties to or in privity with either of the 1939 contracts of Miller & Lux with defendant or the conveyance of 1939 by Miller & Lux and its subsidiaries.[28]
B. Derivation of Title to Plaintiffs’ Lands
56. In 1925, Miller & Lux instituted an intensive program for the sale of much of its land. Tracts of land in varying sizes were sold under deeds containing numerous and differing reservations, conditions, and covenants. In the case of sales of subdivisions of croplands, water rights were usually bestowed on such lands, often in the form of water rights in irrigation districts which had been created by Miller & Lux to provide for this irrigation. In the case of sales of subdivisions of grasslands, which include the lands purchased by some of the plaintiffs herein, Miller & Lux usually incorporated in its deeds provisions reserving certain water rights which otherwise would have gone with such lands on sale, to protect the water and water rights which Miller & Lux had assembled for its croplands. Each deed ordinarily contained several reservations.
57. (a) Certain of the plaintiffs in this case acquired part or all of their lands (1) from Miller & Lux or (2) by mesne conveyances from grantees of Miller & Lux. The reservations inserted in these conveyances are hereinafter noted.
(b) In the deeds to the lands of plaintiffs, which were not purchased from Miller & Lux or its grantees, there are no water reservations.
(c) Following is a tabulation of the several plaintiffs who derived title from Miller & Lux directly or by mesne conveyance.
Count 1. The plaintiff corporation acquired title from Miller & Lux by deed dated August 18,1931.
Count 8. Plaintiff Anna Freitas acquired title by mesne conveyances from Miller & Lux grantees F. T. and V. T. *597 Freitas. There were two deeds from Miller &'Lux: one dated September 25,1931 (which also relates to some of the land in Count-11), and one deed dated January 25, 1932 (which also relates to part of the land described in Count 9).
Count • 9. Plaintiffs Anna Freitas, Frank Freitas,' and Vernon Freitas acquired title by mesne conveyances from Miller &.Lux grantees F. T. and V. T. Freitas.- -íhere were four deeds from Miller & Lux: one deed dated January 25, 1932, to. F.- T. and V. T. Freitas, which included Parcel 1 of these plaintiffs’ lands; one deed dated March 26, 1935, to F. T. and V. T. Freitas, which covered Parcel 2 of these plaintiffs’ lands; one deed dated September 12,1933,- to V. T. Freitas, covering Parcel 3 of plaintiffs’ lands; and one deed dated April 30,1934, to V. T. Freitas, covering Parcel- 4 of the lands of these plaintiffs.
Count 11. Plaintiff Irma Freitas acquired title by mesne conveyance from Miller & Lux grantees F. T. and V. T. Freitas, the land being part of the land .described in the Miller & Lux deed of September 25,1931.
Count 12. Plaintiff Irma Freitas (sometimes known as Erma Freitas Brazil) acquired title by mesne conveyance from Miller & Lux grantee Cyrus J. Sheppard, whose deed was dated October 1,1933.
(d) The foregoing tabulation lists the following deeds from Miller & Lux:
(1) August 18,1931, to Gustine Land & Cattle Company, Inc. (Count 1);
(2) September 25,1931, to F. T. and V. T. Freitas (Counts 8 and 11);
(3) January 25, 1932, to F. T. and V. T. Freitas (Counts 8 and 9);
(4) September 12,1933, to V. T. Freitas (Count 9);
(5) October 1, 1933, to Cyrus J. Sheppard (Count 12);
(8) April 30, 1934, to V. T. Freitas (Count 9); and
(7) March 26,1935, to F. T. and V. T. Freitas (Count 9).
58, (a) The deed of August 18, 1931, from Miller & Lux to Gustine Land & Cattle Company, contained the following exceptions and reservations:
1. That the party of the second part shall have the right to impound any-water it may receive from the natural flow of Los Garzos Creek, and/or from subter *598 ranean waters, and/or from pumps, and by means of existing boxes or other suitable headgates in the Fremont and Horseshoe grades in Sections Fourteen (14), Twenty-three (23), and Twenty-six (26) of Township Eight (8) South, Range Nine (9) East, to hold such water to an elevation of 76.6 feet as related to the existing U.S.Gr.S. bench mark near the southeast corner of Section Fourteen (14), Township Eight (8) South, Range Nine (9) East, this bench mark being read at 76.0.
2. That said lands have heretofore been supplied with water purchased by the party of the first part.from the San Joaquin & Kings River Canal & Irrigation Company. The party of the first part reserves the right to said water and water right, and the party of the second part shall not be entitled to the same. The party of the first part may transfer said water right and use the water heretofore applied to said lands on any other land which it may own.
3. That the party of the first part has heretofore received water from the San Joaquin & Kings River Canal & Irrigation Company by means of a reconstructed channel of Los Garzos Creek along the north line of Section Twenty-seven (27) and Twenty-eight (28).
The party of the first part reserves the right, subject to the condition hereinafter stated, to take said water from said reconstructed channel and pass the same over the lands herein conveyed in order to irrigate other lands of the party of the first part surrounding the land conveyed by this deed. Party of the second part agrees not to change the natural conditions of said land so as to prevent said water from passing over said land, except as herein mentioned. The party of the second part, however, shall be entitled to raise the water level existing at any time, to an elevation of 76.6 feet by impounding the water as provided in Paragraph One herein, and to maintain the same, at said level even though said party of the first part may be taking said water across said land. In determining what water party of the first part shall be entitled to receive after having passed the same through said land as above described, consideration shall be given to the water level on said land at the time party of the first part commences to discharge said water on the same, the amount or quantity of water which party of the second part may have impounded as provided in Paragraph One, and the ordinary losses by evaporation or seepage in passing said water through said land.
*599 4. That the existing levee in Section Eleven (11), situated just , beyond what is known as “Goose Lake”, shall be maintained so that the natural drainage or the flow of any water belonging to the party of the first part can pass on to adjoining lands of the party of the first part or its successor.
5. That no dams or levees, or any other obstruction, except present existing ones, shall be placed in the deep slough running through the east half of Sections Fourteen (14) and Twenty-three (23) without the written consent of the party of the first part. This slough is east of the Horseshoe grade, and is erroneously referred to on the U.S.G.S. Topographical map, as “Los Garzos Creek”, being in fact the continuation of Los Banos Creek.
6. That the San Joaquin & Kings Eiver Canal & Irrigation Company and the party of the first part shall have the right to continue to use Los Garzos Creek to relieve its canals of surplus or waste waters, and that neither said Canal Company, nor party of the first part, shall be liable to the party of the second part for damages by reason of any such waters being turned on to the lands described in this conveyance and the party of the second part shall take any and all steps necessary to relieve said lands of the waters so turned on it, provided, however, that party of the second part shall not be required to pay for said water.
(b) The lands described in Count 8, Count 9 (Parcels 1,2, and 4), and Count 11 (Parcel 1) are all subject to the following exceptions and reservations among others. (The precise language of several of the deeds varies in minor particulars. The parties have agreed, however, that for present purposes the substance and intention expressed in each deed are the same.)
(f) The right to take, divert, store and use the waters of the San Joaquin Eiver and its tributaries, whether naturally flowing therein, or being thereinafter stored or used by any other persons, at any place or places above the land herein conveyed, and use the same for the irrigation of riparian or nonriparian lands, and/or for the production of hydro-electric power or any other purpose for which the party of the first part desired to use the same. The rights herein reserved may be transferred to and exercised by any public district or private corporation, firm, or individual to which the party of *600 .the first part may transfer' or assign said rights. Provided, however, that nothing herein contained shall be construed to in any way affect any right of the parties of the second part to take, divert or use on the land herein conveyed, any water flowing in the- Said river at their said land, and not taken, diverted or used by. the party of the first part, or anyone to whom the party of the first part has or shall hereafter grant the right to divert water, but nothing herein contained shall obligate- the party of the first part, or its assigns to permit, or cause to be permitted, any amount of water of the said river to be or flow at the land herein conveyed.
(g) The right to conduct or carry excess or waste waters from any irrigation canal owned by the party of the first part or The San Joaquin & Kings Elver Canal & Irrigation Company Incorporated, or its successors and assigns, across the above-described land, and that the parties of the second part shall not acquire any right in or to said waters, and any use which the parties of the second part shall make of said water shall be deemed to be permissive and not under claim of fight.
(h) Pending the sale of its grassland waters tó any water storage district or irrigation district, or until the party of the first part desires to change the place of use of said water to other lands, whether or not in ownership of the party of the first part, the party of the first part may divert from the San Joaquin Kiver and apply to said lands for the irrigation thereof, in the customary manner, the quantity of water heretofore applied according to past usage. The parties of the second part shall acquire no right, title or interest in or to said water or the use thereof by virtue of said application of said water to said land.
(j) It is further understood that the water rights reserved in the preceding paragraphs, and the covenants therein contained, shall be considered as easements in the land hereinabove conveyed, and shall run with and bind said land and subsequent purchasers thereof.
(k) It is further understood that the land herein conveyed is part of a larger tract of land belonging to the party of the first part bordering on a natural stream and watercourse and this conveyance shall in no way affect the riparian rights of the remainder of said tract of land retained and owned by the party of the first part, but such riparian rights shall be preserved and be unaffected by this conveyance.
*601 (c) The reservations and exceptions set forth in the preceding subsection as clauses (g), (h), and (k), were likewise contained in the Miller & Lux conveyances of the lands described in Count 9 (Parcel 3) and Count 12.[27] These conveyances also contained the further reservations and exceptions identified as clause (d), as follows:
(d) The riparian rights of the land herein conveyed shall always remain and be exercised subject and subordinate to the "water rights of the party of the first part, its successor, subsidiary and affiliated companies, whether such water rights be riparian, appropriative or prescriptive, to the end that the party of the first part, its successors, subsidiary and affiliated companies may use, enjoy and transfer said water rights, including the right to contract for or permit storage on the upper reaches of the San Joaquin River without let or hindrance from the party of the second part, his heirs and assigns. These covenants and conditions shall not be construed as an extinguishment of the riparian rights of the land herein conveyed, but as an estoppel in favor of the party of the first part, its successors, subsidiary and affiliated companies, against the party of the second part, Ms heirs and assigns, to the extent herein provided.
C. Riparian Rights of Plaintiffs’ Lands
59. (a) Some of plaintiffs’ lands are (and on March 14, 1950, were) riparian to the San Joaquin River or its sloughs; some are contiguous to the river or its sloughs, with riparian status modified in varying degrees; and some are noncontiguous and nonriparian to the surface flow of the San Joaquin River or its sloughs.[28] All of the lands overlie the underflow of the San Joaquin River and ground waters fed by it.
(b) Table XIII[29] identifies the lands by count number and parcel and indicates the acreage that is riparian, contiguous, and not contiguous (nonriparian).
*602 D. Water From the CCID
60. (a) The parties have agreed that each of the following parcels contains the following acreages lying within the Central California Irrigation District:

Water from the river is used on land within the CCID in Counts 5 and 7.[30]
(b) Table XIV[31] contains a more detailed tabulation of lands within and without the CCID, with distinctions between developed croplands and pasturelands.
Vm. SOURCES OK THE LANDS5 water supplies
A. Surface Water
1. State of Nature
61. Since the lands in suit were within the Santa Rita Flood Plain, they received the natural flow of the San Joaquin River prior to the interruptions of such natural flow by manmade structures. The river was then free to cut channels, sloughs, and backwater sluices, and to develop its alluvial fans, underground aquifers, and ground water tables through the architecture of the elements and the laws of nature.
*603 2. Before Friant Dam
62. (a) Upstream Alterations. In 1939, when construction of Friant Dam was begun, the natural flow of the river was being controlled, retarded, and diverted by an intricate complex of electric power installations and irrigation works. Upstream owners retained riparian rights and had developed additional rights based upon appropriation and prescription.
(b) Floodwaters. Previous 'findings recite that “* * * there was a period in most years * * * when there was an excess of water over the requirements of all appropriative and prescriptive rights,” [32] and that while “Miller & Lux and its subsidiaries utilized such parts of the * * * flood-waters as they could control * * *, the remaining part of the floodwaters flowed out over the flood plains of the river, elsewhere referred to as the Santa Bita Flood Plain, and eventually made its way back into the river and flowed downstream.”[33]
Prior to the construction of Friant Dam, therefore, some of the lands in controversy received the floodwaters of the river in substantial, albeit somewhat curtailed, volume. These floodwaters overflowed much of the low-lying lands, moistening the uncontrolled grasslands as well as the controlled grasslands. In most years the floodwaters filled all channels and sloughs to overflowing.
(c) High Waters. The high water flows occurred just before and just after the floods of winter and spring. The demand for water was at its lowest before and after the winter flood and before the spring flood.
Prior to the construction of Friant Dam, therefore, the lands in controversy received substantial parts of the flow of high water. This water filled the high channels of the river, including sloughs and backwaters.
(d) Low Waters. The lower stages of the river’s flow occurred after the subsidence of the high flow following the spring flood, usually not before July 15th of an average year. Low waters continued through the remaining season of crop *604 land irrigation, when the demand for water was at its highest. During such remaining cropland irrigation season, practically all of the water then'originating above-Friant Dam was 'diverted from the river upstream from plaintiffs’ lands (at Mendota Pool and Sack Dam).
Prior to' the construction of Friant Dam, therefore, virtually none of the natural flow of the river in its low stages reached plaintiffs’ lands in the low channels.
(e) Return Flow. Diversions of water by Miller & Lux and its subsidiaries at. Mendota Pool and Sack Dam were for the purpose of irrigation. Some of the return flow- of this irrigation water reached the low channels and sloughs of the river, and some of it percolated into the underground water tabled
3. After.Friant Dam and Before the Delta-Mendota Canal
63. (a) Floodwaters. The floodwaters of the San Joaquin come from winter rains or spring snowmelt. Each year the amount of contribution of water from rain and snowmelt depends ■ entirely upon the vicissitudes of - nature. Friant Dam and Miller-ton Lake, in conjunction with canal diversions, will accommodate -503,200 acre-feet of water for flood storage. Floods in excess of this flow cannot be stored. Releases are made from Friant to provide flood storage in anticipation of the annual floods. But approximately 1 year in 4, there will be a flood on the San Joaquin River above Friant which, within a relatively short period of time, will contribute a quantity of water in excess of the available storage. Such, floods will be referred to herein as extraordinary floods. Such extraordinary floods overflowed the lowlands below Friant Dam, including the flooding of such of plaintiffs’ lands as were subject to flooding before the building of Friant Dam.
Since the completion of Friant Dam, therefore, the lands in suit have not received the floodwaters of the San Joaquin River in manner or quantity comparable to the flows of such waters before the construction of Friant Dam.
(b) High Waters. The curtailment of the'quantity and the alteration of the times of the flow of floodwaters, through the controls of Friant Dam, resulted in similar curtailment *605 of the quantity arid trie flow of high waters.- Since trie completion of Friant Dam,; during dry years, trie lands dn - suit riave not received trie riigri water flows of trie San Joaquin Diver in manner ór .quantity comparable to trié flows, of sucri waters before trie-construction of Friant Dana.-; -. . .. /
■ (c) Low Waters. Prior-to trie completion óf'the Delta-Mendota Canal, defendant released from Friant Dam enough water to supply (1) certaimriparian rights downstream from Friant to Gravelly Ford and (2) the irrigation. needs of Miller & Lúx and its subsidiaries. . The extent of ..diversion of such waters at Mendotá was much, trie saíne as before. Consequently,. trie lands in suit received virtually none of trie low flow in terms, of flow through trie low channels of trie river.
(d) Return Flow. Plaintiffs’ lands received the return flow of irrigation water, after trie construction of. Friant Dam and before trie exchange of waters, in much the same manner and quantity, and with trie same effect, as had been trie case prior to the construction of Friant Dam.
4. After the Delta-Mendota Canal
-64. (a) Exchange and Diversion. Trie first integrated operation of trie Central Valley project occurred in August 1951, upon the completion of trie initial features of the Delta-Mendota Canal. With exchange waters available to supply trie demands of Miller & Lux and its subsidiaries at Mendota Pool, diversions of San Joaquin water at Friant were increased, trie increases going largely into the Friant-Kern Canal. By July 1953, trie San Joaquin River was being substantially diverted.
(b) Floodwaters. As heretofore noted, floods of sufficient magnitude to warrant substantial releases of excess water from Millerton Lake riave occurred once in 4 years, on trie average, since 1944. Sucri releases have occurred since trie completion of the Delta-Mendota Canal, as well as before. No material change in the flow of floodwaters resulted from trie operation of that canal. The significance of the completion of trie Delta-Mendota Canal has been that, since it was placed in full operation, in 1953, any substantial quantity of *606 water passing plaintiffs’ lands derives from sources other than the San Joaquin River except in times of extraordinary flow.
(c) High Waters. The elimination of the flow of flood-waters, except in times of extraordinary floods, has meant the virtual elimination, subject to the same exception, of the flow of high water.
(d) Low Waters. The exchange waters in Mendota Pool were as fully diverted into irrigation works as had been the case before the exchange. Consequently, after the exchange, as well as before, the lands in suit received virtually no water in terms of natural flow through the low channels of the river.
The significance of the exchange lay in the fact that the water supply came from the Delta rather than from the San Joaquin River.
(e) Return Flow. Plaintiffs’ lands received the return flow of irrigation water after the exchange, as well as before. The quantity was somewhat more plentiful after the exchange, because of the larger and more constant supply. The water was, however, water from the Delta, and not from the San Joaquin River.
5. The Intrusion of the Friant-Kern Canal
¡65. (a) Friant Dam was completed in 1947. Since its completion, as heretofore noted, the lands in suit have not received either the floodwaters or the flows in the high channel in manner or quantity comparable to the flows of such waters before the construction of the dam.
(b) Diversions at Friant into the Madera Canal were begun as early as 1947. Tables I, II, and III show the following diversions into that canal:

Year Aere-feet

1947 _ 78,833
1948 _ 75,000
1949 _151, 508
Meanwhile the flows below Friant were as follows:

Year Acre-feet

1947 _ 1,108,470
1948 _ 1,028,690
*607 (c)The Friant-Kem Canal was ready for partial operation in July 1949, and for full operation on March 14,1950. The diversions into that canal were as follows:

Year Acre-feet

1947 _ 0
1948 _ 0
1949 _45,118
(d) Except for these diversions in 1947, 1948, and 1949, water had to be released from Friant Dam into the channel of the San Joaquin Eiver, to the extent needed for flood control, since there was nowhere else to put it. Consequently, during the nonirrigation season, the flows in the low channel (and sometimes in the high channel) were somewhat higher and certainly more sustained than had been the case before the controls of Friant Dam were placed in operation.
(e) The initial diversions into both the Madera and the Friant-Kem Canals were made to build up the ground water table near the canals and in some measure near the area to be served. The evidence does not specify the date when the Madera Canal was placed in full service operation. The inference to be drawn from the tables of diversion and stream-flow is that such full operation was begun in 1949. Likewise, the evidence does not specify the date when the Friant-Kem Canal was placed in full operation. The inference to be drawn from the tables of diversion and streamflow is that such full operation was not achieved until 1953, when the Delta-Mendota Canal was equally ready for full operation. The pertinent data follow:

Acre-feet

Year Madera Friant-Kem

1950 - 118,321 195,449
1951 - 142,429 391,414
1952 - 181, 361 529, 304
1953 - 191,523 679,976
Comparable figures for the flows below Friant follow:

Year Aere-feet

1950 - 1, 085, 710
1951 - 1, 063,410
1952 -^_ 2, 079, 040
1953 - 862,060
*608 (f) The specifications in the hables of' diversion- and streamflow (by months) below Friant for the years 1947-1952 (both inclusive) warrant the inference that once the controls of Friant Dam had been fully imposed, the new regimen of . the river (in terms of floods and high waters) was not materially altered until 1953. During these years (1947-1952), the heaviest concentration of flows was in April, May, and June; the next highest concentration was in July, August, and September (the crucial'months of the irrigation season); the third order of magnitude was in January, February, and March; while the lowest concentration of flow was in the fall months of October, November, ■and December.
(g) The years of significant developments, relating the construction and operation of the Central Valley project to alterations of the surface water supplies of the lands in suit, were 1947, marking the completion of Friant Dam, and 1953, marking the completion and full operation of the Delta-Mendota Canal. No material significance attaches to the date (March 14, 1950) when the Friant-Kern Canal was ready for full operation.
B. Subsurface Waters
1. The Ground Water Tables
66. (a) The marine water table at the lower level of the ground water table confined below the Corcoran clay has no bearing on the water supply available to the lands in suit.
(b) Otherwise, the lands in suit overlay the ground water tables, confined and unconfined, and had access to them by means of wells as sources of supply of irrigation water and for other uses.
67. (a) It is not established by the evidence that the construction of the Central Valley project (including the imposition of controls at Friant Dam, the diversions at Friant into the Madera and Friant-Kern Canals, or the exchange of waters at Mendota Pool via the Delta-Mendota Canal) had any effect upon the confined fresh water table underlying the Corcoran clay that is material to the availability, *609 quantity, or quality of that water table as a potential supply of water to the lands in suit for irrigation or other uses.
(b)The unconfined ground water table "(extending from the top of the Corcoran clay to levels within a few feet, of the surface of the earth) was affected by the curtailment and ultimate diversion of the flows of the San Joaquin River in that there was some subsidence of the top level of the ground water table. This subsidence was not extensive. In relation to lands improved for irrigated row crop culture, the subsidence was an advantage, in that prior to its occurrence the ground water table had been too close to the root zones in many areas. In relation to some pasturelands, the subsidence was a disadvantage in that the lowered level deprived such lands of subirrigation of grass roots theretofore enjoyed.
2. Wells
68. (a) Wells on the lands in suit, used to supply water for irrigation, or to water cattle, or for domestic use, were sometimes deep, sometimes shallow, sometimes in between.
(b) Deep wells could penetrate. the Corcoran clay and draw water from the confined water table. While the evidence indicates that there were some such wells on some of the parcels of land in suit, they are not clearly identified. Their specific identification is immaterial, since, as noted in finding 67(a), it does not appear that the availability, quantity, or quality of the water supply from that source has been materially affected by the Central Valley project.
(c) A well could penetrate the soil down to or approaching the top level of the Corcoran clay without penetrating it and still be a deep well. The descriptive term “deep” is. therefore relative. Wells considered deep, or between deep and shallow, drew water from the unconfined water table above the Corcoran clay. Usually there were in the casings' of such wells perforations at various levels, enabling them to draw water from such varying levels.
(d) Shallow wells penetrated only a short distance below the top of the water table and relied on a relatively narrow cross-section of the water table gradient as their sources of supply.
*610 C. Quantities of Water Available
1. Overall — Surface and Subsurface
.69. (a) Before Frimt Dam. Subject to tbe upstream diversions (described in finding 20), the annual flows of the river (summarized in finding 18) reached the lands of plaintiffs before the construction of Friant Dam as floodwaters, flows in the high channel, and return flows of irrigation water. On the average, approximately one-half of the annual discharge of the river at Friant was diverted upstream and one-half flowed past the lands of plaintiffs.
(b) These flows were seasonal. As indicated in finding 18(b), some 55 percent of the annual discharge occurred in the 8-month period of April, May, and June, while 18 percent of the flow occurred during the crucial irrigation season of July, August, and September, leaving 27 percent for the 6-month period of October through March. The flows in the first quarter (January, February, and March) were appreciably heavier than were the flows in the last quarter (October, November, and December).
(c) The flows of the river contributed to the ground water table. Some of the floodwaters unquestionably seeped and percolated through the topsoil to the ground water table. The principal source of recharge of ground water, however, was percolation through the banks of the river and sloughs. During periods of high flows in the river, the gradient of the water table extended outward and downward from the channels of flow. As the flows in the river subsided, the gradient was reversed, becoming downward toward the channels of flow.
Í70. (a) After Friant and Before Delta-Mend ota. The construction of Friant Dam did not, of course, affect the potential annual discharge of the river. It affected only the distribution of the discharge.
(b) The effect of Friant Dam (before the completion of the Delta-Mendota Canal) on the distribution of the river’s discharge was twofold. As the Madera and Friant-Kern Canals were made ready, water was diverted into them as indicated in finding 65. The diversions upstream from plaintiffs’ lands were increased accordingly, and the flows *611 past the lands were diminished. The amounts of these increases and diminutions were relatively small. Of greater moment to plaintiffs was the result of the application of controls at Friant, in altering the regimen of the river in terms of floods, flows in the high channels, and seasonal availability of water.
(c) Whereas, before Friant, 82 percent of the yearly discharges of the river occurred during months other than the crucial irrigation season, leaving only 18 percent for that season, the flows below Friant after construction of the dam placed 72 percent during months other than the irrigation season, and 28 percent in the irrigation season. In terms of quarterly flows, the 55 percentage points of April, May, and June, before Friant, were replaced by 43 percentage points after Friant. Whereas the fall and winter months had seen 27 percentage points of the flow before Friant, these months had 29 percentage points after Friant.
(d) The conclusion follows that the application of controls at Friant Dam, beginning not later than 1947 (and having their inception as early as 1944), resulted in (1) curtailment and virtual elimination of floodwaters (except for the extraordinary flows in 1 year out of 4); (2) substantial increases in the water available during the irrigation season; and (3) somewhat higher and considerably more sustained flows in the channels of the river and its sloughs during the nonirrigation season, particularly April, May, and June.
71. (a) After the Délta-Mendota, Oanal. Operation of the Delta-Mendota Canal, providing Delta water in exchange for San Joaquin water at Mendota Pool, made possible the diversion of all San Joaquin water at Friant excepting only (1) the amounts required to supply riparian rights from Friant to Gravelly Ford and (2) releases made in the interest of flood control.
(b) Once the exchange of waters was begun in full force (in 1953), all floodwaters were eliminated (except for the extraordinary flows 1 year in 4), and flows in the high channel were reduced and made dependent upon the timing and volume of releases made for flood control.
(c) The inference to be drawn from the evidence (which is not altogether clear on the point) is that the subsidence of *612 the level of the ground water occurred, in the main, following the systematic lowering of the flows in the high channels. This would place its beginning about 1947.
(d)After the Delta-Mendota Canal was placed in full operation, in 1953, the supply of irrigation water at Mendota Pool was greater in volume and more sustained and reliable in quantity than had been the case either before Friant or after Friant and before the Canal.
2. Increases in Use of Irrigation. Water
72. (a)' The much publicized migration of new population into southern California began shortly after the close of World War II, sparked by men who had been stationed in California.while in the armed services. This migration, well underway in 1950, continued throughout the next decade.
(b) The completion of the Delta-Mendota Canal and the prospect of ample and sustained quantities of irrigation water led to the improvement- for irrigated row crop culture of extensive acreages not theretofore used in lands upstream from the lands of plaintiffs on the San Joaquin River. A similar development occurred along the reaches of the Merced River.
(c) Prior to these developments, the Merced River had made a substantial contribution to the flows in the low channel of the San Joaquin downstream from the confluence of the Merced.
(d) At the time of the trial of this action, in October 1961, the region here involved was experiencing the third of a series of relatively dry years. The drought did not affect the supply of exchange water at Mendota Pool, since the Sacramento drainage basin continued to provide an ample supply. The drought did affect the contributions of the Merced and other tributary streams, by severely curtailing their flows.
(e) The increase in lands developed for irrigation placed a greater demand upon the available supply of water.
(f) At the time of trial (1961), and possibly during the preceding year or two, the supply of irrigation water available to the lands of plaintiffs lying downstream on the San Joaquin from the confluence of the Merced, insofar as such *613 supply came from surface flows in the bed of the river and its sloughs, was less than had been the case in prior years. The supply of ground water, in terms of volume available for irrigation, was unaffected.
IX. SALINITY
A. Nature of the Problem
73. (a) In a state of nature, mineral salts are present in varying amounts in all soils. Many of these salts are soluble in water, including (among many others) sodium, calcium, magnesium, and boron. In solution, some salts replace acids to form alkali. Chemical reactions also occur in solution, with various effects on the soils over which the waters flow or through which they percolate. As evaporation occurs, some salts are deposited on or in the soils. The salt content of the soil to be irrigated therefore represents the starting point of the problem of salinity in relation to any irrigation area or, indeed, to any irrigated field.
(b) A second factor is the degree of salinity of the water available for irrigation, since all water, even if it begins with the purity of snowmelt, picks up salts in the course of runoff or of seepage into and through the soils. Moreover, in the process of irrigation, transpiration is added to evaporation as a cause of deposits of salt on and in the soils. When irrigation water is used over and over again (as is often the case with the return flow of irrigation water), salinity increases markedly with each use.
(c) The accepted antidote to the gradual increase in the salt content of irrigated land is expressed in terms of maintaining the salt balance, the ideal of which is to provide for the removal each year of as much salt as has been brought into the area.[34]
*614 (d) Volumes have been and are being written on the problem of salinity in the practice of irrigation. For present purposes, the problem may be outlined in terms of (1) the concentration of salts, in the soil and in the ground water table; (2) the allowable extremes of purity and impurity in irrigation water; and (3) the application of sound irrigation practices.
B. The Concentration of Salts
1. In the Soils
74. (a) Throughout the geologic processes of the depositions of alluvial materials in the grasslands area of the Lower San Joaquin Valley (wherein lie the lands in suit), the soils being laid down had a tendency to be gently irregular, forming small closed depressions or surface pockets. These pockets would retain water from the flood periods. The water in turn would evaporate during the summer. Concentrations of mineral salts from the water were thus left in these depressions each year. Through the series of years constituting a geologic period, additional alluvial deposits were brought down to add to the soil. Each new deposition sealed in the salts previously deposited. The process continued until salt beds were made by the evaporation of the water and the concentration of mineral salts in the soils.
(b) The mineral salts contributed by the east side streams were primarily bicarbonates of calcium, sodium, and magnesium. The waters picked up those salts by washing over the exposed granitic igneous rocks of the Sierra Nevada Mountains. The contribution of floodwaters from the east side streams accounted for the greatest part of the water coverage in the grasslands area. While the concentration of salts in the water of the San Joaquin River was low, the residues left from the evaporation of water from it and other east side streams over the periods of years constituting geologic time left the grasslands deeply impregnated with these salts.
(c) Many of the soils in the grasslands area were classified as alkali soils. They were slick and gelatinous and would not permit the penetration of water. This condition was due to the sodium concentrates which were delivered in historic times by the clean San Joaquin floodwaters.
(d) The west side streams also made some contribution to *615 the geologic buildup of the lands involved in this suit.[35] These streams were high in sulphates and chlorides and carried reasonably high concentrates of other salts, among which was boron. The ground water in the vicinity of these west side streams generally reflects the character of the stream water, bearing high concentrates of sulphate and relatively high concentrations of boron.
2. In the Ground Water[36]
75. (a) The formation of salt beds and the lesser accumulations of concentrated salts have had a pronounced effect on the unconfined ground water table.[37] Throughout the years that irrigation has been practiced in the grasslands area, experience has shown that the quality of water drawn from the ground water table may be good or poor (relatively fresh, or quite brackish), depending upon the location of the well and the character of the geologic formation of the soil at that point.
(b) The depth of a well (in the unconfined water table) apparently has little if any relation to the quality of the water obtained from it. Again, the quality may be good or poor, which indicates an extensive degree of stratification in the ground water table, and little if any movement at levels other than the very top.
78. (a) As previously noted, when surface water is flowing in the channels of the river and sloughs at a level higher than the top of the ground water table, the gradient of the water table is outward and downward, away from the *616 channels. As the surface flow subsides, the gradient is reversed, and the movement is inward and downward toward the channels. These movements are relatively slow, being at the rate of approximately 1 foot per day, varying with the porosity of the soil. The fluctuations of the gradient represent the extent of movement in the ground water table. Water lying below the level of the bottoms of the channels of the river and sloughs has no outlet other than percolation, which in this instance is severely restricted by the presence of the Corcoran clay.[38]
(b) Within the narrow limits of the fluctuations of the gradients, the floodwaters and flows in the high channels had some effect in diluting and leaching the higher concentrates of saline water lying at the very top of the water table. Otherwise, references to “flushing” and “cleansing” the ground water table by the flowing action of the river tend to exaggerate the importance of such dilution and leaching. Ground water is generally stagnant. It tends to stratify, creating pools of widely variant quality, some good and some poor. The flow of the river, pre-Friant, did not flush or cleanse the ground water in the sense of accelerating its movement, or of displacing substantial quantities of more highly concentrated saline solutions with solutions less concentrated.[39]
(c) For the purpose of lands improved for irrigated row crop culture, the slight subsidence of the ground water table (making it fall below the root zone in areas where it had previously invaded such zone) was of greater advantage than any disadvantage resulting from the loss of minor “flushing” or “cleansing” action.[40]
*617 C. Suitable Irrigation Water
i77. (a) In terms of dissolved solids, rainwater and snow-melt are almost as pure as distilled water. If the runoff from the mountain watershed reached the irrigation areas in such purity, it would be almost as far from ideal for the purpose as is water which contains too many dissolved solids. Such a possibility is theoretical, of course, since waters do acquire dissolved solids (salts) in the course of runoff.
(b) The possibility of irrigation water containing too many dissolved solids is, on the other hand, a very practical reality. Water in which the salts in solution have reached too high concentration is unsuitable for irrigation use and should be wasted.
(c) One question therefore is, at what stage of concentration must water be condemned as waste. There is no specific answer upon which experts agree, other than that there is such a point and that water which reaches or exceeds that point should be wasted.
(d) A second question is, how far along toward the condemnation stage is it prudent or practical to use water of concentrated solution. Again there is no agreed answer.
78. (a) Analysts of salinity speak in terms of “total salts,” frequently referred to as “parts per million (ppm),” or “total dissolved solids (TDS).”
(b) The individual salt elements include the cations [41] of calcium, magnesium, sodium, and potassium, and the anions [42] of bicarbonate, carbonate, sulphate, and chloride.
(c) The presence of mineral salts has a direct relationship to the electrical conductivity of the water. Therefore, the presence of total salts is sometimes determined by its electrolyte concentration (EC) or its power to conduct an electric charge measured by millimhos.[43]
79. (a) All of these terminologies (ppm, TDS, EC, mhos) are, of course, useful in the laboratory.[44] They are, however, *618 unsatisfactory and even inaccurate terms for describing the quality of irrigation water in the context of this case. To the layman they convey only a crude, generalized means of cataloging the total salts in a specimen of irrigation water.
(b) Some salts are heavier than others. Calcium has a chemical equivalent of 20; sodium has a chemical equivalent of 23; and potassium has a chemical equivalent of 39. It would thus take 39 ppm of potassium in water to equal the impact of 23 ppm of sodium or 20 ppm of calcium.
Also, some salts are slow to react, while others have an immediate effect upon the plant.
Some of the chemicals in the water may react with certain chemicals in the soil to create compounds and also to facilitate the leaching of certain salts out of the soil.
If the soil has an excess of sodium carbonate or bicarbonate, the remaining salts in the soil will be entirely sodium which tends to make the soil gelatinous rather than floccu-lated. The gelatinous soil becomes impermeable to water and is referred to as alkali or black alkali soil.
(c) Irrigation water to be beneficial must have chemical constituents which will react to the sodium, flocculate the soils, increase permeability and drainage, and let the water reach the root zone and wash out the deleterious salts.
The infiltration capacity of water depends on two factors: the concentration of electrolytes, and the relationship of calcium and magnesium to the sodium salts of the soil. The electrolytes are salts with electric charges which tend to induce charges in clay particles in the soil, producing the effect of keeping the soil open and permeable. This is the process of flocculation. The relationship of calcium plus magnesium to sodium induces flocculation in a sour soil that is gelatinous and tends to make it become granulated.
(d) Certain salts, such as boron, lithium, fluorine, molybdenum, and salinium, are toxic to plantlife. Some of these toxic salts may be essential in small quantities, but toxic if they appear in concentrated form. Thus, the nature of the salts is a more important factor than the measurement of total salts in ppm or TDS.
80. (a) Water debouched at Friant by the San Joaquin *619 Paver normally contains 40 to 44 ppm of salts. Before the exchange of waters at Mendota Pool, these waters (of relative purity) were used in irrigation from Friant to Mendota and from Mendota to the southern end of the Santa Bita Flood Plain. The salt content increased appreciably with each such use. It was these waters, with increased and increasing salt content from the transpiration of plantlife and other evaporation, which reached the lands of plaintiffs as return flow.
(b) The average quality of the exchange waters delivered at Mendota Pool between 1952 and 1959 was approximately 330 ppm. These waters were used in irrigation from Men-dota to the southern end of the Santa Bita Flood Plain before they reached the lands of plaintiffs as return flow. Each such use increased the salt content. Moreover, the number of users increased appreciably between 1950 and 1961 as more and more acreages upstream from plaintiffs’ lands were improved for irrigated row crop culture.
(c) Between 1953 and 1961, there was an appreciable increase in the salinity of return flow irrigation water available to those of plaintiffs’ lands which lie north of the confluence of the Merced Biver. Contributing causes of the increase in salinity included (1) the increase in the number of users along the San Joaquin Biver upstream from the lands of plaintiffs; (2) the increase in the number of users along the reaches of the Merced Biver; (3) the occurrence of a series of dry years in 1959, 1960, and 1961; and (4) the increase in the salinity of water delivered to Mendota Pool. In terms of the relationship of these causes, one to another, the increase in salinity at Mendota Pool was of minor importance.
(d) The increase in salinity described in the preceding paragraph did not make the return flow waters available to plaintiffs unsuitable for use in irrigation. It did have two other effects: (1) some landowners among the plaintiffs found it necessary to change from salt-sensitive crops to salt-tolerant crops; and (2) virtually all of the plaintiffs engaged in irrigated row crop culture found it necessary to apply additional water for leaching.
*620 (e) It is not established by the evidence (1) that the increase in salinity of return flow irrigation water ever depressed the market value of the lands of plaintiffs or (2) that in 1950 reasonably well-informed buyers or sellers of lands in the vicinity anticipated or were even aware of a salinity problem potential.
D. Sound Irrigation Practices
1. Irrigation Water
81. (a) The essential elements of good irrigation water, in the order of their importance, are (1) sufficient quantity, (2) availability when needed, and (3) proper quality.
(b) The quantity of water delivered by the Delta-Mendota Canal to Mendota Pool was substantially greater than had been the case before the exchange of waters was begun.
In order for the quantity to be sufficient, there must be enough water (1) to keep the root zone of the crops supplied with water through the growing season and (2) to provide a surplus for necessary leaching. The quantity of substitute water at Mendota Pool was, from the beginning, as large as the average flows from the river and has since been increased to match the highest flows of the river during the irrigation season. Consequently, there was and is a surplus to satisfy the needs for leaching.
(c) Availability (when needed) demands the presence of an ample supply during the critical seasons to foster growth. The supply of substitute waters at Mendota Pool has been water that has been definitely fouled. The methods by which this could be done have long been known and in use on a smaller scale.[45] If and when the accumulation of salts should become a serious economic hazard, adequate steps to safeguard the area may be confidently anticipated.
*621 X. DEPRIVATIONS
A. Grouping
84. (a) Plaintiffs are consistent in their contentions, throughout the 19 counts of the petition, that the deprivations, upon which they rely to establish takings, occurred on March 14,1950, and represent burdens imposed on their lands by the construction and operation of the Central Valley project.
(b) It is nevertheless possible to divide the alleged deprivations in point of time into two broad groups: (1) the loss of the flows of the river; and (2) the increase in salinity. The crucial date for this division is July 1953, rather than March 1950. Upon the beginning of full operation of the Delta-Mendota Canal, the loss of the flows of the river was complete while the increase in salinity was just beginning.
B. Loss of the Flows of the River
85. (a) The loss of the flows of the river reflects the curtailment and eventual elimination of the floodwaters and the flows in the high channels of the river and its sloughs. It is subject to further subdivision, covering:
(1) The loss of floodwaters formerly relied upon as surface flow to moisten pasturelands.
(2) The loss of the contribution of the floodwaters and the flows in the high channels to the ground water table which, prior to its subsidence, had provided some subirrigation to native pastureland by raising the level of the ground water table.
(3) The loss of the flows in the high channels formerly more reliable than the pre-Friant flows of the San Joaquin River.
If the return flow available to plaintiffs was less, in 1961, than it had been prior to 1953, the causes were the increase in the number of users upstream from the lands of plaintiffs on both the San Joaquin and the Merced Rivers and the drought of 1959-1961.
(d) The element of quality involves four factors: (1) total 'salts; (2) nature of the salts; (3) toxic constituents; and (4) infiltration capacity. Measured by these standards, *622 tlie substitute waters delivered to Mendota Pool are superior to the waters formerly flowing in the San Joaquin Liver.
2. Leaching
82. (a) Leaching is accomplished by flowing water over the field after the crops have been harvested for the express purpose of washing some of the accumulated salts through the soil past the root zone to the level of the water table.
(b) The crux of sound irrigation practices is leaching. Assuming a supply of usable irrigation water and the proper application of such water (in amount and time) for the sustenance and growth of plantlif e, there must be applied to the land from time to time additional amounts of water to pick up and dissolve such salts as have been added to the soil by evaporation and transpiration and carry them down through the soil -below the root zone to the top of the ground water table where the saline solution can drain away by gravity or be drained away by pipes or pumps. • Proper leaching is of the essence in the maintenance of the salt balance of any given irrigation area.
(c) In order for leaching to be successful, the level of the water table must be somewhat below the root zone. Where this condition obtains, the leaching water, carrying excess salts from the soil, will remain at the top of the water table and move with it slowly toward the channels of the river and sloughs, there to run off in the low water season.
83. For the maintenance of the “salt balance” of the irrigated lands of the Central Valley as a whole, in terms of the type of accumulation of salts which might ruin the entire project, State and Federal authorities 'have under discussion (and some plans for) the creation of drains to carry away relied upon to maintain one fishing-boating camp in being and the campsite potentials of nine other locations.
(b) The loss of the flows of the river is also alleged to have deprived plaintiffs of the flushing and cleansing action of such flows upon the ground water table and upon the lands of plaintiffs in removing saline solutions (from the ground water) and salts (from the soil).
(c) The deprivations described in subparagraphs (a) (1) and (2) of this finding relate primarily to grasslands (includ *623 ing native pasture and some potentials for permanent pasture).
The deprivation of water to support recreational camps (fishing and boating), described in subparagraph (a) (3) of this finding is further described hereinbelow.
The deprivation described in subparagraph (b) of this finding relates primarily to the increase in salinity, further defined in the next finding.
C. The Increase in Salinity
86. (a) The deprivation herein described as the increase in salinity includes all of the factors relating to the alleged diminution in quantity and degradation of quality of irrigation water after the flows of the river had been stopped and the substitution of waters had been begun. These factors include:
(1) The increase in the salinity of water available to plaintiffs for irrigation of row crop cultures, which in turn involves (i) detrimental increase in the salinity of (aa) the surface waters (return flow in the channels of the river and sloughs) and (bb) the ground waters, and (ii) detrimental buildup of salts in the soil.
(2) The increase in the cost of leaching, to ameliorate if not to prevent the degradations described in (1) above.
(b) The deprivations described in subparagraph (a) of this finding (of which the deprivation described in subpara-graph (b) of finding 8S is a part) relate primarily to lands improved or capable of being improved for irrigated row crop culture.
D. Campsites
87. (a) The deprivation of which the claimants in Count 2 primarily complain consists of the loss of the flows of the river upon which they had relied in the maintenance and operation of a fishing camp, where the owners had a store and some cabins, and small boats for hire.
(b) In nine other counts[46] the claimants complain of the loss of the flows of the river as having deprived them of the potentials of locations within their lands for development of recreational (fishing-boating) campsites.
*624 (c) A significant distinction exists between the deprivation of which the Count 2 owners complain and the deprivation of which the others complain, in that the owners of the land in Count 2 acquired their land in 1944, whereas the other plaintiffs had owned their lands before the construction of Friant Dam. The significance of the distinction lies in the fact that the claimants who complain of the loss of potentials can trace their deprivation to the loss of the pre-Friant flows of the river, whereas the Count 2 claimants can complain only of the loss of the artificial regimen of the river, created by the construction of Friant Dam, and maintained by the Central Valley project only during the years 1944 to 1953.
XI. DIMINUTIONS IN VALUE
A. Grouping
88. (a) Plaintiffs are consistent in their contentions, throughout the 19 counts of the petition, that the alleged takings of which they complain resulted in diminutions in value of all of the lands in suit and that such diminutions are determinable as of March 14, 1950, the date upon which they rely as the date of the takings.
(b) It is nevertheless possible to divide the alleged diminutions in value into the same two broad groups used in finding 84 to define the deprivations, viz, (1) diminutions in value resulting from the loss of the flows of the river; and (2) diminutions in value resulting from the increase in salinity. The first category relates primarily to grasslands (native pasture and potentials for permanent pasture), while the second category relates primarily to lands improved (or capable of being improved) for irrigated row crop culture. The campsites are reserved for separate attention.
B. Grasslands
89. (a) With respect to diminutions in value of grasslands, distinctions must be observed between (1) the fact of diminution, (2) the date it occurred, and (3) the amount of the diminution.
(b) The inferences to be drawn from the evidence as a whole are:
*625 (1) That there was, in fact, a diminution in value of the grasslands as a result of the loss of the flows of the river.
(2) That such diminution in value began as early as 1941.
(3) That the situation which caused the diminution had become stabilized by 1947, in that the consequences of the loss of the flows of the river had by that time so manifested themselves that a final account could then have been struck.
(4) That such evidence as there is in the record relating to valuations of the grasslands is insufficient to support a finding of the amount of the diminution.
C. Croplands
90. The evidence as a whole warrants the finding that no diminution in value of lands improved (or susceptible of improvement) for irrigated row crop culture has occurred at any time material to this action.
91. (a) Plaintiffs agree that the market value of irrigation lands was higher in October 1961 (the date of trial) than in March 1950. They cite the inflation of the decade as the contributing factor primarily responsible for this increase and contend that values in 1950 dollars would show a diminution in value after the burden of the Central Valley project was imposed as compared with the value before the burden was imposed. The inference to be drawn from the evidence as a whole is that rising market values of irrigation lands was one of the factors (the statute of limitations was another) leading to the selection of March 1950 as the date of taking.
(b) Reference has been made in finding 72(a) to the dramatic growth of population in southern California during the decade of the 1950’s. What happened to real estate values in that region, including the Lower Valley of the San Joaquin River, is graphic proof of the validity of the appraisers’ maxim that people make values.
During the second half of the decade the pressure of increasing population resulted in the urbanization of extensive areas of farmland to the northwest and southwest of the lands in suit. Farmlands in the urbanized areas were sold for residential subdivisions. Sellers of these lands were caught between the Scylla of sales prices, vastly increased because of the higher and better use of their lands, and the Charybdis *626 of capital gains taxes. They navigated the passage by paying inflated prices for other farmlands, including irrigation lands in the area in suit. The standard inflationary tendencies of the 1950’s were thereby compounded by the pressures of tax avoidance.
92. The evidence on which plaintiffs rely to prove a diminution in value of irrigation lands as of March 1950 is unconvincing. The values sought to be established for the lands before the burden was imposed rest altogether on the estimates of plaintiffs’ appraiser, without benefit of comparable sales (since, as plaintiffs agree, there were no sales of comparable lands “without the burden” for several years prior to 1950). All other opinion of informed persons in the area was to the effect that there had been no diminution in value, in 1950 or since.
D. Campsites
1. The Camp in Being
93. (a) Clyde and Ethel Beatty, claimants in Count 2 of the petition, bought their 10-acre tract in 1944 for approximately $6,000. It was contiguous to the San Joaquin Eiver and bordered on the highway. The land had been on the market (for sale) for 2 years. It had, at the time of their purchase, the beginnings of a camp. The Beattys made some improvements on existing buildings, added some new cabins, and operated what they called Catfish Camp. The cabins were rented to fishermen, who bought tackle and supplies from the Beatty store and rented small boats from them. The operation of the camp was profitable.
(b) There were fish in the river during 1944 and succeeding years. Some of the fish, such as salmon, ran up the San Joaquin River into the Merced. As the diversions of water upstream increased, the fish runs declined. After the flows of the San Joaquin were stopped, the fish all but disappeared. From 1953 to the time of trial in 1961, the Beattys relied on a different patronage for the operation of the camp. The business continued to be profitable, but was not as profitable as it had been.
(c) The Beattys complain of the deprivation of the flows of the river and contend that they are entitled to the benefit *627 of the Diehvnson doctrine, saying that the situation which caused the deprivation did not become stabilized until 1950, in that the consequences of the loss of the flows of the river had not until that time so manifested themselves that a final account could be struck. This contention is valid, if the Beattys had a right to the flows of the river as they had known them to be from 1944 through 1952.
(d) The flows of the river from 1944 through 1952 represented an artificially created regimen of the river, brought into being by the construction of Friant Dam and maintained by the evolutionary operation of the Central Valley project.
(e) The inference to be drawn from the evidence as a whole, insofar as it relates to Catfish Camp, is that the Beattys bought the place at the trough of a market depressed by wartime conditions and diminished values resulting from the known effects (actual and prospective) of Friant Dam, and thereafter realized something of a bonanza from the cessation of hostilities, increasing population, and the years of delay in full, integrated operation of the Central Valley project.
(f) The evidence on which these claimants rely to establish a diminution in value of their campsite in March 1950 as a result of the operation of the Central Valley project is unconvincing. It does not warrant a finding that such a diminution in value actually occurred.
2. Potential Campsites
94. (a) All other claimants who complain of the loss of the flows of the river as having impaired the value of their lands in relation to campsites rest their claims on the alleged impairment of potentials. They assert that from 5 to 10 acres of land would be needed for a camp (the Beattys used 3 acres) and that lands having such a potential were worth $2,000 per acre solely because of the potential. Such lands, undeveloped, were usually given over to marsh, sandbars, and brush, and were virtually useless except insofar as they provided physical access to the river for the installation of pumps or drains.
(b) The flows of the river lost to these claimants were, for the purposes of their campsite claims, the river’s flows pre- *628 Friant. The evidence warrants the conclusion that such possible campsites had some potential value, but never of a magnitude remotely related to the values claimed for them. The inferences to be drawn from the evidence as a whole, in relation to the potential campsite claims, are the same as those stated in finding 89(b) in relation to the grasslands.
XII. SPECIFIC CLAIMS
A. Count 1
95. (a) Owner. The land in Count 1 was, on March 14, 1950, owned by the Gustine Land & Cattle Company, Inc.[47]
(b) Description of the Land. The tract contains 2,217 acres. It is considered as one parcel. The soil is of a type that is difficult to drain.
These lands are not contiguous or riparian to the San Joaquin River or any of its sloughs. They are riparian to Los Garzos and Los Banos Creeks, which flow through the lands.
(c) Uses of the Lands: (1) Actuad Use. On March 14, 1950, these lands were used for grazing cattle during 9 months of the year and as duckpond land for 8 months (open to gun clubs for shooting wild ducks which came there to nest in the course of their flyway). They have continued to be so used since 1950.
(2) Potential Uses: (i) Absent the Project. If the Central Valley project had not been built, some 800 acres of the Gustine lands might have been developed as irrigated permanent pasture, using a combination of surface and ground water. Their development for irrigated row crops would not have been economically feasible, since the subsoil could not readily be drained or leached. Some rice had been grown on the land in years past. The highest and best use of the lands, without the project, was as pastureland (native and permanent in combination), and for recreation (gun clubs) in the winter season.
(ii) With the Project. After the floodwaters were cut off, the carrying capacity of the lands (for the grazing of cattle) was diminished. This diminished use for grazing, and con- *629 tinned nse bj gun clubs, represented its highest and best use, after the floods were controlled.
(d) Water Supply. In pre-project days, water flowed into Los Garzos Creek from three sources: (1) floodwaters from the San Joaquin River; (2) runoff from the west side streams; and (3) water taken out of the San Joaquin River by one of the Miller & Lux canal companies at various times for irrigation of Miller & Lux lands.[48] In ordinary and wet years, the spill of San Joaquin floodwaters amounted to approximately 4,000 acre-feet.
In addition to the foregoing, Gustine had access to the ground water,[49] and beginning in 1944, it purchased from CCID each fall 2,000 acre-feet of water to fill its duckponds.[50]
(e) The Deprivation: No Diminution, No Talcing. The construction of Friant Dam, followed by the operation of its controls, resulted in depriving the Gustine lands of 4,000 acre-feet of floodwaters formerly available to them between April 15 and June 1 each year.
The portions of findings 84-94 relating to grasslands apply to the lands in Count 1.
The conclusion follows that there has been no compensable taking of any right pertaining to these lands.
B. Count 2
96. (a) Owners. The land in Count 2 was, on March 14, 1950, owned by Clyde and Ethel Beatty.
(b) Description of the Land. The tract contains 10 acres and is described in the petition as one parcel. It is contiguous to the San Joaquin River,[51] and borders on a highway, there *630 by giving access to the river by traveling a short distance across the Beatty land. The soil is Class B.
(c) Uses of the Land: (1) Actual Use. On March 14, 1950, 7 of the 10 acres were leveled for ditch irrigation and were used for the growing of row crops and a small orchard. On the other 3 acres the Beattys maintained the small business known as Catfish Camp, which is described in finding 93.
(2) Potential Use. The uses hereinabove described represented the highest potential of the tract. After the Central Valley project was fully developed, the same potential obtained, except for changes in the patronage of the store and camp.
(d) Water Supply. The Beattys relied on the return flow of irrigation water in the bed of the river for the irrigation of their row crops and orchard. While the land has access to the ground water, no specific claim has been asserted with respect to it. For the maintenance and operation of Catfish Camp, the Beattys relied on the flows of the river as indicated in finding 93.
(e) The Deprivations: No Diminution, No Taking. With respect to the irrigated lands the deprivations of which the Beattys complain are those described in findings 84^94 in relation to irrigated lands and the increase in salinity. The deprivation relating to Catfish Camp is described in finding 93.
All relevant portions of findings 84-94 apply to the land in Count 2.
The conclusion follows that there has been no compensable taking of any right pertaining to this land.
C. Count 3
97. (a) Owner. The land in Count 3 was, on March 14, 1950, owned by George Covert.
(b) Description of Land. The tract contains 281 acres. It is contiguous to sloughs of the San Joaquin Biver.[52] Of the 281 acres, the soil in 266 acres was Class B while 15 acres were of Class C soil. Eighty acres had been leveled for ditch *631 irrigation; 100 acres were nearly level, and were sprinkler irrigated; 93 acres bad not been (but could have been) leveled; and 8 acres were given over to tbe banks of tbe river. Part of tbe tract’s river frontage adjoined the main highway between Modesto and Vernalis.
(c) Uses of the Land: (1) Actual Use. As of March 14, 1950,80 acres were in ditch irrigated permanent pasture; 100 acres were in sprinkler irrigated permanent pasture; 93 acres were in native pasture; and 8 acres of riverbank were undeveloped and unused.[53]
(2) Potential Use: (i) Without the Project. If the Central Valley project had not been built, some of the ditch irrigated land could have been developed for row crops, and much of the native pasture could have been leveled for sprinkler irrigated permanent pasture.
(ii) With the Project. With the Central Valley project in operation, a similar portion of the ditch irrigated land was susceptible of row crop farming,[54] while the remainder of that area, plus the other two portions (sprinkler irrigated permanent pasture and native pasture), held the potential for sprinkler irrigated permanent pasture.
(d) Water Supply. Water for irrigation was taken from the return flow in the river channel and from the ground water table. Pre-Friant, the pasturelands had had the benefit of the flows of the river.
(e) The Deprivations: No Diminution, No Taking. The owner complains of all of the deprivations described in findings 84-94, except finding 93. With the one exception, all portions of findings 84-94 are relevant and applicable to the lands in Count 3.
The conclusion follows that there has been no compensable taking of any right pertaining to this land.
D. Count 4
98. (a) Owners. On March 14, 1950, the land in Count 4 was owned by Walter W. and Virginia N. Crawford.
(b) Description of the Land. The tract as a whole contains 320 acres. It is described in the petition as two parcels. *632 Parcel 2 contains 213.32 acres which, the parties agree, are riparian. Parcel 1, containing 106.68 acres, adjoins parcel 2, and defendant challenges its status as riparian. As far as the evidence discloses, the whole tract was originally riparian, and its division into two parcels was not made under such circumstances as to deprive Parcel 1 of its riparian status.
(c) Uses of the Land: (1) Actual Use. As of March 14, 1950, 237 acres, flood protected, were leveled for ditch irrigated row crop culture and were so used,[55] while 78 acres, not flood protected, were in native pasture.[56] Five acres were given over to the banks of the river and sloughs.
After March 1950, 45 of the 78 acres were leveled for irrigation, leaving 33 acres in native pasture.
(2) Potential Use. Absent the Central Valley project, all of the 315 acres (i.e., the whole tract excepting the riverbank area[57]) were susceptible of development as irrigated cropland. It is not established by the evidence that this potential was reduced by the development of the project.[58]
(d) Water Supply. For their water supply the owners relied on the return flow of irrigation[59] and on wells drawing ground water.
(e) The Depri/oations: No Diminution, No Taking. The deprivations of which the owners of Count 4 land complain are substantially the same as those in Count 3.[60] The same portions of findings 84-94 are therefore relevant and ap~ *633 plicable. The conclusion follows that there has been no-compensable taking of any right pertaining to these lands..
E. Count 5
>99. (a) Owner. The land in Count 5 was, on March 14,. 1950, owned by Hazel P. Crow.
(b) Description of the Land. The tract contains 261.11 acres and is considered as one parcel. It is riparian to the-San Joaquin River and its sloughs.
(c) Uses of the Land: (1) Actual TJse. As of March 14,., 1950, 198.4 acres had been developed as irrigated row cropland. Thereafter, 22 acres more were so developed. Twelve-acres remain in native pasture. The remaining 28.6 acres-were assigned to riverbanks and creek edges.
(2) Potential Use. As of March 14, 1950, and before-(prior to the construction of the Central Valley project),, 282.4 acres were susceptible of development for irrigated row-crop culture. The 28.6 acres in riverbank were not so-susceptible.[61]
(d) Water Supply. Of the 198.4 acres in irrigated row crop culture as of March 14, 1950, 170.4 acres were within, the CCID. The owner relied upon the CCID for irrigation) water, although the water from this source was supplemented' by water from the river. The water supplied by the CCID" came from Mendota Pool. It was therefore subject to the-exchange of waters in 1953.
The water used for irrigation of the remaining 50 acres of' developed land came from the river, i.e., the return flow of' irrigation.
Ground water was available, but was not used.
(e) The Deprivations: No Diminution, No Taking. The-deprivations of which the owner of Count 5 land complains, are substantially the same as those in Comit 3.[62] The same- *634 portions of findings 84-94 are therefore relevant and applicable. The conclusion follows that there has been no com-pensable taking of any right pertaining to this land.
F. Count 6
100. (a) Owner. The land in Count 6 was, on March 14, 1950, owned by Dr. Lloyd B. Crow.
(b) Description of the Land. The tract contains 629.5 acres, and is described as three parcels. Parcel 1 contains 419 acres. It is away from the river, but is contiguous to the rear lines of Parcels 2 and 3 and is riparian through Parcel 2.[63] Parcel 2 contains 107.75 acres, of which 5 acres were acquired by accretion. Parcel 3 contains 102.75 acres. It adjoins the river and is riparian.
(c) Uses of the Lands: (1) Actual Use. On March 14, 1950, 27 acres in Parcel 2 were in pasture. Six to 10 acres were occupied by the banks of the river. All of the remainder (502-596 acres) had been developed as irrigated cropland.
(2) Potential Use. Absent the project, the 27 acres of pastureland could have been developed for row crop culture. There is no indication that the same potential did not exist after the construction of the Central Yalley project.
The claimant contends that the 6 to 10 acres of riverbank held a potential, pre-project, for development as a recreational area.
(d) Water Supply. The 419 acres in Parcel 1 (away from the river) were irrigated with water from the CCID. The Irrigation District got its water from Mendota Pool. The remainder of the irrigated lands drew water from the river by pumps. Ground water was available, but was not used.
(e) The Deprivations: No Diminution, No Taking. The deprivations of which the owner of Count 6 lands complains are substantially the same as those in Count 3.[64] The same *635 portions of findings 84-94 are therefore relevant and applicable. The conclusion follows that there has been no com-pensable taking of any right pertaining to these lands.
G. Count 7
10L (a) Owner. On March 14, 1950, the owner of the land in Count 7 was Eoy F. Crow.
(b) Description of the Land. The tract contains 383.56 acres, all described as one parcel. It was contiguous to the river.[65]
(c) Uses of the Land: (1) Actual Use. On March 14, 1950, 208.23 acres were in irrigated cropland, while the remainder (125.33 acres) were in native pasture, subject to reduction by a few acres given over to riverbanks. After 1950, 42 acres of the native pastureland were developed for irrigation, so that at the time of trial in 1961, 250 acres were irrigated, and 83.56 acres were in native pasture (including the riverbank area).
(2) Potential Use. Absent the project, the entire tract (except for riverbanks) could have been developed into irrigated cropland. There is no indication that this potential was reduced by the construction of the project.
The claimant contends that the riverbank area had a potential, pre-project, for development as a recreational area. At one time, prior to March 1950, the owner had charged fees for use of the area by fishermen. A road ran through the farm to the river.
(d) Water Supply. All of the 208 acres developed as cropland by 1950 were in the CCID, but at that time (1950) only 81 acres were irrigated exclusively with CCID water. The other 127 acres were irrigated largely by river water, supplemented by the CCID. The 42 acres subsequently developed were irrigated by river water only. Eiver water was the only source available for development of the 83 *636 acres of native pasture into irrigated cropland. Ground water was available, but was not used.
(e) The Deprivations: No Diminution, No Taking. The deprivations of which, the owner of Count 7 land complains, are substantially the same as those in Count 3.[66] The same portions of findings 84 — 94 are therefore relevant and applicable. The conclusion follows that there has been no com-pensable taking of any right pertaining to this land.
H. Count 8
■102. (a) Owner. The lands in Count 8 were, on March 14,, 1950, owned by Anna Freitas.[67]
(b) Description of the Land. The tract contains 4,578.8. acres. It is described in the petition as two parcels. Parcel 1 contains 2,939.11 acres; Parcel 2, 1,639.69 acres. Of the-2,939.11 acres in Parcel 1, 2,779.11 acres are riparian to the-San Joaquin River or Salt Slough, while 160 acres are non-contiguous. Of the 1,639.69 acres in Parcel 2,1,379.69 acres, are riparian, while 260 acres are noncontiguous. The owner-acquired title by mesne conveyances from Miller & Lux grantees F. T. and V. T. Freitas. The lands are therefore subject to the exceptions and reservations set forth in finding 58(b).
Parcel 1 contains 1,963 acres of Class B (good) soil; 346 acres of Class C (medium) soil; and 630 acres of Class B-(Waukena) soil.
Parcel 2 contains 113 acres of Class A (very good) soil; 507 acres of Class B soil; 338 acres of Class C soil; and' 681 acres of Class D soil.
These lands extend some 4 miles along Salt Slough and 3 miles along the San Joaquin River, in a strip varying from y2 mile to 1 y2 miles in width.
(c) Uses of the Lands: (1) Actual Use. As of March 14, 1950, and for many years prior thereto, and at the time of trial in 1961, the lands were used as native pasture.
*637 (2) Potential Use. Absent the Central Valley project, relatively small portions of those lands could have been developed for irrigated row crop culture and some larger portions could have been developed as irrigated permanent pasture. It is not established by the evidence that, as the owner contends, virtually all of this tract could have been developed for irrigated row crop culture. Those portions not susceptible of irrigation development were usable as native pasture. Portions of the land also had potentials for use by gun clubs. It is not established by the evidence that, as the owner contends, portions of the lands had potentials for other recreational uses, such as fishing campsites.
After the construction of the Central Valley project, these lands held the same potentials as before for limited irrigation development into row crop culture and permanent pasture, and for use by gun clubs. Their potential for use as native pasture was impaired by controls imposed on the flood and high channel flows of the river.
(d) Water Supply. Before the construction of the Central Valley project the lands in Count 8 received the flows of the river that were typical of the grasslands in their general area. Floodwaters passed over them twice a year, in winter and spring. There were flows in the high channel immediately before and after the floods. During the summer and fall only the return flows of irrigation were in the low channels of the river.
The ground water table was unusually close to the surface of these lands.
After the construction of Friant Dam, the floods and flows in the high channel were controlled. The floods had been stopped, except for 1 year in 4, by 1947. The flows in the high channel were controlled from that time until July 1953, when they were virtually stopped by the channeling of water into the Friant-Kem Canal.
(e) The Deprivations: No Diminution, No Tahing. The owner of the Count 8 lands complains of the losses (1) of the annual floods (with diminution of grazing capacity and loss of subirrigation for flushing and leaching); (2) of the waters with which to develop (i) 3,267 acres to cropland culture and (ii) 1,317 acres to irrigated permanent pasture; *638 and (3) of tbe flows of tlie river which, would have sustained the potentials of “appropriate sites” on the riverbanb in each of the parcels for development as recreational areas.
The construction of Friant Dam, followed by the operation of its controls, has deprived the lands in Count 8 of the floodwaters and flows in the high channel formerly available to them in winter and spring. These deprivations were either complete or well underway by 1946-1947. The evidence as a whole warrants the inference that the consequences of the loss of these waters were sufficiently manifest to permit a final balance to be struck before March 10, 1949.[68]
The pertinent portions of findings 84r-94 are relevant and applicable to these lands. The conclusion follows that there has been no compensable taking of any right pertaining to these lands.
I. Count 9
103. (a) Owners. The lands in Count 9 were, on March 14, 1950, owned by Anna Freitas as life tenant and Frank Freitas and Vernon Freitas as remaindermen.
(b) Description of the Land. The tract contains 1,881.19 acres. It is described in the petition as four parcels.[69]
Parcel 1 contains 911.7 acres, of which 659 acres are riparian to Salt Slough and 280 are not riparian to the surface flow but have access, with the 659 acres, to the ground water. The soils are: 30 acres, Class A; 458 acres, Class B; 170 acres, Class C; and 253 acres, Class D.
Parcel 2 contains 281 acres, all riparian to Mud Slough, and all Waukena soil (Class 4). These lands also have access to ground water.
Parcel 3 contains 238.84 acres, of which 60 acres are riparian to Mud Slough, while the balance is not riparian but has access to the ground water. The soil is Waukena.
Parcel 4 contains 450 acres, all riparian to Salt Slough. The soils are: '24 acres of Class A; 364 acres of Class B; 39 acres of Class C; and 23 acres unspecified.
In the tract as a whole, by way of recapitulation, the soils are: Class A, 54 acres; Class B, 822 acres; Class C, 209 acres; Class D, 773 acres; with 23 acres unspecified.
*639 Title was derived from Miller & Lux by mesne conveyances. Parcels 1, 2, and 4 are subject to the exceptions and reservations set forth in finding 58 (b), while Parcel 3 is subject to the exceptions and reservations set forth in finding 58(c).
(c) Uses of the Lands: (1) Actual Use. As of March 14, 1950, for many years prior thereto, and at the time of trial in 1961, these lands were all in native pasture.
(2) Potential Uses. The potentials of this tract were and are the same as the potentials of the lands in Count 8.
(d) Water Supply. The water supply of the lands in Count 9 was and is the same as the water supply of the lands in Count 8.
(e) The Deprivations: No Diminution, No Tahi/ng. The owners of the lands in Count 9 complain of the same deprivations as does the owner of the lands in Count 8. The actual deprivations were the same on both counts. The same portions of findings 84-94 are therefore relevant and applicable. The conclusion follows that there has been no compensable taking of any right pertaining to these lands.
J. Count 10
104. (a) Owners. The lands in Count 10 were, on March 14,1950, owned by Anna Freitas as life tenant and by Irma Freitas Peichoto, Annie Freitas Silva, Frank T. Freitas, Jr., and Vernon Freitas as remaindermen.
(b) Description of the Lands. The tract contains 937.42 acres. It is described in the petition as six parcels.
Parcel 1 contains 102.4 acres. It abuts on and is riparian to the San Joaquin River. The soil is Class B.
Parcel 2 contains 168 acres, with soils of Class A and Class B. While it is not contiguous to the river, it is riparian through Parcel 1, from which it has never been severed in such a way as to affect its riparian status.
Parcel 3 contains 208.91 acres. It is not riparian, but has access to ground water. The soils are: Class A, 7 acres;. Class B, 202 acres.
Parcel 4 contains 105 acres. It is not riparian to surface flows, but has access to ground water. The soil is Class B.
Parcel 5 contains 172.18 acres. It is not riparian to surface- *640 ¡flows, but has access to ground water. The soil is all Class B.
Parcel 6 contains 180 acres. It is not riparian to surface jflows, but has access to ground water. The soil is Class B.
(c) Uses of the Lands.
(1) Parcel 1: (i) ActucdUse. On March 14,1950, before ¡and since, this parcel has been used as native pasture.
(ii) Potential Use. Either before or after the construction ■of the Central Valley project this parcel could have been ■developed for irrigated row crop culture.
(2) Pa/rcel 2: Actual Use. On March 14,1950, this parcel had been developed for irrigated row crop culture. This was iits highest potential.
(3) Parcel 3: (i) Actual Use. On March 14,1950, before ■and since, this land was used for native pasture.
(ii) Potential Use. Either before or after the project this parcel might have been developed as sprinkler irrigated ■permanent pasture, although from an economic standpoint ¡such an undertaking would have been marginal.
(4) Parcel J/,: (i) Actual Use. On March 14, 1950, before ¡and since, this parcel has been used for dry farming (the .growing of crops with light rainfall as the only source of irrigation).
(ii) Potential Use. Either before or after the project, this parcel could have been developed for sprinkler irrigated use for suitable row crops or for permanent pasture.
(5) Parcels 5 and 6. The actual and potential uses of these parcels were the same as the actual and potential uses of Parcel 4.
(d) Water Supply.
(1) Parcel 1. Being riparian, this parcel could draw water from the river. It also had access to the ground water.
In pre-project days, 25 acres were subject to the annual floods.
(2) Parcel 2. In addition to the same potential water ■supply as Parcel 1 (other than flooding), Parcel 2 was serviced by the COLD.
(3) Parcels -5,1, 5, and 6. Not being riparian, these parcels had no access to surface water for irrigation. Pre-project, the annual floods extended over 30 acres of Parcel 3, *641 30 acres of Parcel 4, 25 acres of Parcel 5, and 2 acres of Parcel 6. There was also some subirrigation: 40 acres of Parcel 3; 40 acres of Parcel 4; 85 acres of Parcel 5; and 17 acres of Parcel 6. While each of these parcels had access to ground water, there were no wells.
(e) The Deprivations: (1) Floodwaters. The owners have been deprived of the floodwaters (Parcel 1, 25 acres; Parcel 3, 30 acres; Parcel 4, 30 acres; Parcel 5, 25 acres;. Parcel 6,2 acres; total, 112 acres).
(2) Subirrigation and Salinization. All of the remaining deprivations of which these owners complain relate to the loss of quantity or degradation of quality of surface flows (return flow of irrigation for Parcels 1 and 2, and CCID water for Parcel 2) and underground water. There are also the standard additional claims for loss of potentials for recreational development.
(3) Conclusion. The foregoing deprivations are covered by pertinent portions of findings 84-94, which are relevant, and applicable. The conclusion follows that there has been no compensable taking of any right pertaining to these lands.
K. Count 11
105. (a) Owner. The lands in Count 11 were, on March 14,1950, owned by Irma Freitas.
(b) Description of Lands. The tract contains 3,802.68 acres. It is described in the petition as two parcels. Parcel 1 contains 3,618.68 acres. Parcel 2 contains 184 acres. Both parcels are riparian to the San Joaquin Fiver. Title was derived from Miller & Lux by mesne conveyances. Parcel 1 is subject to the exceptions and reservations set forth in-finding 58 (b). Parcel 1 is bounded on either side by highways which cross the river.
The soils in Parcel 1 were: Class B, 2,380 acres; Class Cr 785 acres; and Class D, 454 acres.
(c) Uses of the Lands: (1) Actual Use. On March 14,. 1950, before and since, all of Parcel 1, and all of Parcel 2, excepting 39 acres, were in native pasture. The 39 acres of Parcel 2 had been developed for irrigated cropland by March 14,1950, and were and are served by the CCID.
(2) Potential Use. The undeveloped 145 acres of Parcel *642 2 could have been leveled for ditch irrigation, either before ■or after the construction of the Central Valley project. .The highest economic potential of Parcel 1 was for irrigated permanent pasture.
The owner claims potentials, pre-project, for both parcels for development of recreation areas.
(d) Water Supply. Before Friant Dam, 2,533 acres of Parcel 1 and 92 acres of Parcel 2 received the floodwaters of winter and spring.
Eeturn flow water was available, before and after the project, for irrigation (by pumping) of all of Parcel 2, and for portions of Parcel 1.
There were no irrigation wells in 1950, but such wells ■could have 'been drilled either before or after the project.
(e) The Deprivations: No Diminution, No Talcing. The lands in Count 11 were deprived of the floodwaters in the ■same manner and at the same time as were other lands in •previous Freitas counts.
Other deprivations of which the owner of the lands in ■Count 11 complains include (1) the standard loss of recreational area facilities, and (2) the loss of quantity and degradation of quality of return flow water, with attendant increases of salinity in the water and in the soil and increases in the cost of leaching due to the loss of the cleansing and flushing effects of the normal flows of the river formerly .available.
Pertinent portions of findings 84r-94 are relevant and applicable. The conclusion follows that there has been no com-pensable taking of any right pertaining to these lands.
L. Count 12
106. (a) Owner. The lands in Count 12 were, on March 14,1950, owned by Irma Freitas.
(b) Description of the Lands. The tract contains 2,966.17 .acres. It is described in the petition as two parcels. Parcel 1 contains 2,589.57 acres; Parcel 2, 376.60 acres. All of the •lands are riparian to Salt Slough and Mud Slough, or their branches, except 640 acres. These nonriparian lands have ^access to the ground water. The soils are all Waukena, except 120.60 acres containing a combination of Columbia, *643 Merced, Temple, and Orestimba. Title was derived from Miller & Lux by mesne conveyance. The lands are therefore subject to the exceptions and reservations set forth in finding 58 (c).
(c) Uses of the Lands: (1) Actual Uses. On March 14, 1950, all of the lands in Count 12 were in native pasture. Since that date, the 120.60 acres of non-Waukena soil have been developed to permanent pasture.
(2) Potential Uses. The actual uses, above described, rep-Tesent the highest potential of these lands except for the possibilities (i) that the 120.60 acres of permanent pasture might "have been converted to row crop culture, and (ii) a limited amount of the Waukena soils could have been developed into permanent pasture. These potentials existed after as well as before the project.
(d) Water Supply. Before Friant Dam, an unspecified ■acreage received the floodwaters of winter and spring.
Beturn flow water was available, before and after the project, for the irrigation of the limited cropland potential, and ground water was available for the potential of permanent pasture.
(e) The Deprivations: No Diminution, No Taking. The owner of the lands in Count 12 makes no claim of a potential for recreational development.
She was deprived of the floodwaters by the construction of Friant Dam.
Otherwise, the claimed deprivations are substantially the same as those described in Count 11.
Pertinent portions of findings 84r-94 are relevant and applicable. The conclusion follows that there has been no com-pensable taking of any right pertaining to these lands.
M. Count 13
107. (a) Owner. The lands in Count 13 were, on March 14,1950, owned by A. F. Gervasoni.
(b) Description of the Lands. The tract contains 159.84 acres. It is described in the petition as two parcels. Parcel 1 contains 36 acres; Parcel 2,123.84 acres. None of Parcel 1 is either contiguous or riparian to the river. In Parcel 2, 59.84 acres are riparian; 64 acres are not. These 64 acres, however, were and are in the service area of the CCID. One *644 hundred acres (all of Parcel 1 and the 64 acres in Parcel 2) overlay and had access to ground water.
The soils are: in Parcel 1,18 acres of Class B and 18 acres of Class C; in Parcel 2, 25 acres of Class A, and 85 acres of Class B.
(c) Uses of the Lands: (1) Actual Use. On March 14, 1950,100 acres of the lands in Count 18 had been developed to irrigated row crop culture (64 acres in CCID; and 36 acres using drainage water of the Patterson Water District by its tolerance, but without any legal right). The remaining 59.84 acres were in native pasture. This tract has since been leveled and turned to irrigated row crops, using return flow in the river.
(2) Potential Use. The highest potential of the lands was reached when it all came under irrigated row crop culture.
The owner now contends that some of the riverbank area had potentials for development in recreational uses.
(d) Water Supply. On March 14,1950, the lands in Count 13 were using: by purchase, water from the CCID; and by courtesy, water from Patterson Water District. All of the lands had access to, but were not using, ground water. The 59.84 riparian acres in Parcel 2 had access to, but were not using, water from the river. Such use was, however, begun at a later date.
(e) The Deprivations: No Diminution, No Taking. The claims of the owner of Count 13 lands include the standard claim of loss of recreational value and the 3-pronged claim based on salinity: degradation of irrigation water, surface and subsurface, and loss of productivity of the soil because of increased salinity.
The pertinent portions of findings 84-94 are relevant and applicable. The conclusion follows that there has been no compensable taking of any right pertaining to these lands.
N. Count 14
108. (a) Owner. The lands in Count 14 were, on March 14,1950, owned by Jacob Holtzman.
(b) Description of the Lands. The tract contains 21 acres. It is described as one parcel and is riparian to a former *645 channel (now a slough) of the San Joaquin River. The soil is Class B.
(c) Uses of the Lands: (1) Actual Use. On March 14, 1950, the entire tract was in native pasture. Sometime thereafter, it was planted in walnut trees and sprinkler irrigated. It has never been leveled or leveed.
(2) Potential Use. The tract could be leveled for irrigated row crop culture. Unless and until that is done, the orchard of walnut trees represents its highest potential.
The owner contends that some of the riverbank area had potentials for recreational development.
(d) Water Supply. Pre-project, the native pasture had the 'benefit of the floods of the river, winter and spring, and of the flows in the high channel before and after the floods.
As irrigated land, the tract used return flow[70] in the river and had access to the ground water.
(e) The Deprivations: No Diminution, No Tahing. In view of the fact that the tract had, and has been developed to, a higher use than native pasture, the owner does not now complain of the loss of the floods and high channel flows in terms of native pasture. He does complain of the loss of the normal flows of the river formerly available in terms of their flushing and cleansing effect. Otherwise, the deprivations of which the owner of the lands in Count 14 complains are those which relate to increased salinity of irrigation water (surface and subsurf ace) and of the soil.
The pertinent portions of findings 84r-94 are relevant and applicable. The conclusion follows that there has been no compensable taking of any right pertaining to this land.
O. Count 15
109. (a) Owners. The lands in Count 15 were, on March 14, 1950, owned by Bert F. and Lucile Genevieve Houk.
(b) Description of the Lands. The tract contains 457.5 acres. It is described in the petition as one parcel. It is riparian. The soils are Classes A and B.
*646 (c) Uses of the Lands: (1) Actual Use. On March 14,. 1950, and for sometime prior thereto, 420 acres were in irrigated cropland. The remaining 37.5 acres were waterfront
■ lands, with minor sloughs, and were of marginal agricultural value.
(2) Potential Uses. Irrigated cropland represented the-highest and best use of the 420 acres.
The owners claim for the riverfront lands a potential for recreational development.
(d) Water Supply. Irrigation water was drawn from; the river or pumped from the ground water table.
(e) The Deprivations: No Diminution, No Taking. The owners complain of the loss of the normal flows of the river-as having destroyed the recreational potential of their riverfront lands and of the loss of the effect of those waters in-flushing, cleansing, and leaching the soil and ground water-tables. Otherwise, the deprivations of which they complain are all related to the issue of increased salinity heretofore-described.
The pertinent portions of findings 84-94 are relevant and applicable. The conclusion follows that there has been no> compensable taking of any right pertaining to these lands.
P. Count 16
110. (a) Owners. The lands in Count 16 were, on March 14, 1950, owned by Rubeun P. and Ada Houk. (Rubeun P. Plouk and Bert P. Houk, of Count 15, are brothers.)
(b) Description of the Lands. The tract contains 583.3-acres. It is described in the petition as one parcel. It is-riparian. The soils are Classes A and B.
(c) Uses of the Lands: (1) Actual Use. On March 14, 1950, 523 acres were in irrigated cropland, and 60 acres were-wasteland.
(2) Potential Uses. The foregoing uses represented the-highest potential of the lands, except for the possibility of' reclaiming some of the wasteland for use as native pasture.
(d) Water Supply. Irrigation water was drawn from the-river or pumped from the ground water table.
(e) The Deprivations: No Diminution, No Tahim-g.. *647 Except for the absence of recreational potential in connection with the lands in Count 16, the deprivations complained of' are the same as in Count 15.
The pertinent portions of findings 84-94 are relevant and applicable. The conclusion follows that there has been no. compensable taking of any right pertaining to these lands.
Q. Count 17
111. (a) Owners. The lands in Count 17 were, on March-14,1950, owned by Irma Freitas. In 1954, she sold the tract to plaintiffs C. E. Hubbs, Hazel E. Hubbs, Norman Á-•Thorkelson, and Jean Leona Thorkelson.
(b) Description of the Lands. The tract contains 102.41 acres, described in the petition as one parcel. It is all riparian. The soil is Class B.
(c) Uses of the Lands: (1) Actual Use. On March 14,, 1950, this tract was in native pasture. Thereafter,[71] 98-acres were improved to irrigated row crop culture. The remaining 4 acres are in riverbank.
(2) Potential Uses. Irrigated row crop culture represents the highest potential of the 98 acres of improved land. The 4 acres in riverbank are not developable to higher use.. The owners claim for them a potential for development as a recreational area.
(d) Water Supply. The land abuts on and is riparian ■ to the San Joaquin Elver. It also overlies the ground water table. The owners irrigate the improved land from wells-on their adjoining lands in Count 18.
(e) The Deprivations: No Diminution, No Taking. The-owners complain of the alleged increase in salinity of the-water available for irrigation, surface and ground water,, and of the soil; and of the added cost of leaching; and of the loss of surface flows said to have been usable for the-development of a recreational area on the riverbank.
The pertinent portions of findings 84-94 are relevant and" applicable. The conclusion follows that there has been no-compensable taking of any right pertaining to this land..
*648 R. Count 18
112. (a) Owners. The lands in Count 18 were, on March 14, 1950, owned by C. E. Hubbs, Hazel E. Hubbs, Norman A. Thorkelson, and Jean Leona Thorkelson.
(b) Description of the Lands. The tract contains 278 acres, described in the petition as one parcel. It is all riparian. The soil is Class B.
(c) Uses of the Lands: (1) Actual Use. As of March 14, 1950, some 250 acres of the tract had been improved for irrigated row crop culture. The remainder (except for a small riverbank area) was so improved shortly thereafter.
(2) Potential Uses. Irrigated row crop culture represents the highest potential of these lands. The owners claim a potential of riverbank lands for development as a recreational area.
(d) Water Supply and Deprivations. These items are the same for the lands in Count 18 as for the lands in Count 17, owned by the same persons.
(e) No Diminution, No Taking. As in Count 17, the pertinent portions of findings 84-94 are relevant and applicable. The conclusion follows that there has been no compensable taking of any right pertaining to this land.
S. Count 19
113. (a) Owner. The lands in Count 19 were, on March 14,1950, owned by Manuel E. Nunes.
(b) Description of the Lands. The tract contains 236 acres, described in the petition as two parcels. Parcel 1 contains 116 acres. It is noncontiguous and not riparian. Its soils are: 74 acres, Class A; 45 acres, Class C. Parcel 2 contains 120 acres. It is contiguous and riparian. Its soils are: 20 acres, Class A; 85 acres, Class B; and 5 acres, Class C.
(c) Uses of the Lands: (1) Actual Use. On March 14, 1950, all of Parcel 1 was improved for irrigated row crop culture. Of the 120 acres in Parcel 2, 50 acres had been improved for irrigated row crop culture, and 70 acres were (and still are) in native pasture.
(2) Potential Uses. Irrigated row crop culture represents the highest potential of all of both parcels, except for a small *649 riverbank area as to which the owner claims a potential for development as a recreational area.
(d) Water Supply. Parcel 1, while not riparian, overlies the ground water table, from which water was drawn (1) as the sole source of irrigation water for 59.5 acres and (2) as the primary source of irrigation water for 24 acres, supplemented by deliveries from CCID. Twenty-seven acres were in the CCID and were irrigated exclusively by its water.
Of the 120 acres in Parcel 2, 39 acres of developed land were in the CCID and used water from it, supplemented by water from wells. Well water was used exclusively on 11 acres.
(e) The Deprivations: No Diminution, No Taking. The deprivations of which the owner complains are the same as in Counts 17 and 18. The pertinent portions of findings 84-94 are relevant and applicable. The conclusion follows that there has been no compensable taking of any right pertaining to these lands.
MEMORANDUM OPINION
i
Factual Summary-
The petition in this case contains 19 counts wherein 27 claimants seek just compensation for the taking of water rights affecting 35 parcels of land encompassing more than ■20,000 acres.
These lands are all on the west side of the San Joaquin Diver, in an area known as the Santa Eita Flood Plain, between the towns of Ingomar on the south and Westley on the north in the California counties of Merced and Stan-islaus. The lands of Gerlach[1] are just across the river, and those of Wolfsen[2] are adjacent (upstream).
Historically, as indicated by .all of the Central Valley cases that have been before this court, the development of water rights along the San Joaquin Eiver has been marked by three distinct periods: (1) the era prior to 1870, when the river was in a state of nature; (2) the years from 1870 to 1939, *650 when Miller & Lux dominated the area with manmade installations which interfered with the natural flow of the river; and (3) the years since 1939, marked by the development of the Central Valley project.
In its natural state, the river produced seasonal flows of three types: (1) flood waters (of which there were two flows: one, in December, January, and February, resulting from winter rains; and another in April, May, and June, representing the runoff of the spring snowmelt); (2) the flow in the high channel, which occurred before and after the flood-waters, the difference being marked by the fact that the waters were contained by well-defined banks of the river; and (3) the flow in the low channel, representing the curtailed runoff of the dry season which coincided with the summer months when water was most needed for croplands.
In addition to these surface flows the river had, in the course of geologic time, created a vast complex of underground channels through which it maintained a subsurface (ground) water table at levels a few feet beneath the surface of the earth.
The Miller & Lux cattle-and-farming empire represents one of the great, unsung sagas of the Golden West. Its development was begun in 1870 and was continued into the 1920’s. The holdings of the corporation began with a narrow strip at Gravelly Ford and extended in varying widths down the San Joaquin Eiver to a point just below the junction of the Merced Eiver with the San Joaquin. Several of the plaintiffs in this action acquired their lands from Miller & Lux, either directly or by mesne conveyance.
Mendota Pool and Sack Dam were creations of Miller & Lux, and several of the irrigation companies organized to manage the deliveries of water were its subsidiaries.
Miller & Lux acquired water rights upstream from the lands of plaintiffs through the purchase of riparian lands, and by appropriation and prescription. Just below Mendota Pool and Sack Dam it developed croplands extensive enough to use all of the low-channel flow of the San Joaquin Eiver during the irrigation season, leaving the lands of plaintiffs dependent, during the irrigation season, upon the return flow of irrigation water. Additional controls were installed, from Gravelly Ford downstream almost to the Merced, with which *651 to direct the high-channel flows in such manner as to make the best use of the water for the benefit of Miller & Lux controlled grasslands. Even the floodwaters were controlled where feasible. The lands of the Gustine Land & Cattle Company, plaintiff in Count I of this action, were subjected by Miller & Lux to a servitude for the discharge of floodwaters.
During the years before 1939 (when the construction of Friant Dam was begun), San Joaquin water flowed (1) over the lands of plaintiffs during the winter and spring flood runoffs; (2) past the lands of plaintiffs in the high-channel flows before and after the flood runoffs; (3) in the low-channel flows of return irrigation water; and (4) under the lands of plaintiffs as part of the ground water table.
While the evidence is silent as to the actual uses made of the water from these sources prior to 1940 by the then owners of the lands, it is apparent from the history of the region that the following uses were probably made: (1) the floodwaters (of both winter and spring) benefited the native pasture (uncontrolled grasslands); (2) the high-channel flow was available for diversion for the benefit of permanent pasture (controlled grasslands); (3) the low-channel flow (of return irrigation water) was available for the cultivation of irrigated croplands; and (4) the ground water table was available for pumping to supply either sprinklers for permanent pasture or flows for ditch irrigated croplands.
In addition to the foregoing uses, there were, along the reaches of the river within plaintiffs’ lands, sites which attracted sportsmen — for fishing and boating in the river and for hunting waterfowl (ducks, primarily) on some of the larger pools.
Friant Dam was far enough above ground in 1941 to begin the impounding of water. By 1944, the surface flows of the river were definitely being interrupted. When the dam was completed in 1947, the surface flows of the river became dependent upon the timing and the quantity of releases from the reservoir. Since the completion of the dam, streamflow near Friant has been substantially controlled, so that the regimen of the flow has had little relation to that occurring in the years preceding construction.
These alterations of the natural regimen of the river ef *652 fected substantial reductions in the volume of floodwaters. While the evidence is not too specific in relation to the effect upon flows in the high channel, it must be inferred that the timing of such flows was altered, since the high channel was normally filled only for brief periods before and after the floods. The impounding of water made it possible to release periodically a volume sufficient to overflow the low channel and activate the high channel without producing a flood.
By 1948, the pattern of floodwaters passing over plaintiffs’ lands had been so altered as to destroy any further reliance upon such waters as being beneficial to native pasture. Thereafter, until 1953, there may have been, and probably was, enough water in the low and high channels (except during the irrigation season) to permit continuation of some-benefit to permanent pasture.
The Central Yalley plan contemplated the storage and diversion to nonriparian use of waters of the San Joaquin River originating above Friant Dam and formerly flowing at or below Gravelly Ford except for releases from Friant which would be for one or more of three purposes:
(1) Riparian rights between Friant and Gravelly Ford were to be satisfied by water released from Friant.
(2) Releases were to be made, when water was available, to meet the requirements of the contract with Miller & Lux for the exchange of water. Those demands for San Joaquin water, it was contemplated, would virtually disappear upon the completion of the Delta-Mendota Canal, which would bring Sacramento water to Mendota Pool.
(3) Releases were to be made at any time to provide vacant storage space in Friant Reservoir in the exercise of flood control.
The two canals which were to divert San Joaquin water out of the watershed were the Madera Canal (going north) and the Friant-Kern Canal (going south). Partial operation of the Madera Canal was begun in 1944. Partial operation of the Friant-Kern Canal was begun in 1949 (on July 9); the latter canal was ready for full operation on March 14,1950; but full operation was not achieved until the completion of the Delta-Mendota Canal in July 1953.
Plaintiffs have selected, as the date of taking applicable *653 to all of tibeir claims, the date (March 14, 1950) when the Friant-Kern Canal could have been placed in full operation if the Delta-Mendota Canal had then been similarly ready for full operation.
Between 1947, when Friant Dam was completed, and July 1953, when full operation of both the Friant-Kern Canal and the Delta-Mendota Canal was achieved, San Joaquin water was released from Friant, as above noted, to supply the riparian rights from Friant to Gravelly Ford, to provide the water required by the Miller & Lux agreement at Mendota Pool and below, and to provide storage space in the reservoir for flood control. Demands upon the water supply for the Friant-Gravelly Ford area and for the Miller & Lux agreement were concentrated in the irrigation season — July, August, and September. Peleases made in the interest of flood control were made at other times of the year. These releases were more frequent and consequently in greater total volume before July 1953 (except for occasional spills of floodwaters), than they were after the full releases into the Madera and Friant-Kern Canals.
As heretofore noted, plaintiffs had been deprived of the former pattern of floodwaters and attendant flows in the high channel by 1948. Thereafter, until July 1953, the river probably had more water in its low-high channel during the nonirrigation season than formerly, because of the operation of Friant Dam. That operation did not at this time affect the flow of the return irrigation water in the low channel during the irrigation season. Consequently, it is difficult to see how any significance attaches to the date of March 1950 in terms of regulated, curtailed, or diminished flows of the river.
The initial features of the Delta-Mendota Canal were completed in August 1951, and by July 1953 the integrated operation was fully in effect. Thereafter, the waters of the San Joaquin Liver were substantially diverted in relation to any such water reaching Mendota Pool during the irrigation season. In fact, the only substantial flow of San Joaquin water thereafter touching plaintiffs’ lands was the result of releases from Friant of floodwaters and occasional spills for conservation of storage space.
*654 The integrated operation of the project, by means of the Delta-Mendota Canal, meant that water supplied to Men-dota Pool came from the Delta and consisted primarily of water from the Sacramento River. Plaintiffs complain of the return irrigation water available to them after this exchange as being less in quantity and poorer in quality than they had theretofore received. While the exchange of waters was not begun until 1951 and was not completed until July 1953, plaintiffs nevertheless set the date of alleged taking because of the exchange as March 1950.
ii
The Statute of Limitations
Plaintiffs filed their petition on March 10, 1955. The ■6-year statute of limitations cutoff date was thereby fixed as March 10, 1949. Any takings of water rights by defendant after March 10, 1949, are therefore actionable if there resulted from them any diminution in the value of the affected lands. Similarly, any claim for a taking prior to March 10, 1949, is barred unless it is actionable under the final accounting doctrine of United States v. Dickinson, 331 U.S. 745 (1947).
Insofar as plaintiffs’ claims rest upon changes in quantity or quality of surface or subsurface waters resulting from the substitution of Sacramento for San Joaquin water via the Delta-Mendota Canal, no question of statutory limitation is involved. The substitution of waters did not begin until 1951 and was not completed until 1953. The question is, in relation to these claims, whether or not the taking can be said to have occurred in March 1950.
At the other end of the spectrum are the claims based upon deprivation of floodwaters, which, as heretofore noted, matured as early as 1948. Defendant maintains that these claims are barred by the statute. Plaintiffs contend that even these claims are actionable, under the doctrine of Dickinson.
In the Dickinson case, the Government, without condemning the claimants’ land, dammed a river and raised the water level by successive stages until it flooded part of the claimants’ land. More than 6 years after the dam began to impound water, but less than 6 years after the water reached *655 its ultimate level, the claimants sued for compensation under the Tucker Act. The Supreme Court held that the claim was not barred by the 6-year limitation, saying (p. 749) that—
* * * when the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really “taken.”
There follows an additional passage from the Court’s opinion (p. 749):
* * * The source of the entire claim — the overflow due to rises in the level of the river — is not a single event; it is continuous. And as there is nothing m reason, so there is nothing in legal doctrine, to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized. An owner of land flooded by the Government would not unnaturally postpone, bringing a suit against the Government for the flooding until the consequences of inundation have so manifested themselves that a final account may be struck. * * *
As applied to the instant case, there is no doubt of the right of any of the plaintiffs to postpone suit “until the situation becomes stabilized * * * [or] * * * until the consequences * * * have so manifested themselves that a final account may be struck.” The striking of a balance in a final account reflects the essence of the Dickinson decision, as it has been applied in subsequent cases. United States v. Dow, 357 U.S. 17, 27 (1958); Nadder Foundry and Machine Company, Inc. v. United States, 143 Ct. Cl. 92, 95, 164 F. Supp. 249 (1958); Clifton Products, Inc. v. United States, 144 Ct. Cl. 806, 809, 169 F. Supp. 511 (1959).
What, specifically, was the “situation” that was to become stabilized? The “consequences” which were so to manifest themselves that a final account might be struck were the .consequences of what?
In DicMnson, “* * * [T]he source of the entire claim” was “the overflow due to rises in the level of the river” attendant upon the construction of the dam. The overflow did not occur all at once. It was “not a single event” but a *656 “continuous” thing. This was the “situation” that was to become stabilized. The varying levels, of the overflow were the “consequences” which were so to manifest themselves that a final account might be struck.
So, in the instant case, defendant’s interference with the floodwaters flowing over plaintiffs’ lands was accomplished by degrees. From a small beginning in 1941, the pace was increased in 1943 and 1944, and brought to fruition in 1947. As applied to claims for loss of values of grasslands moistened by the floodwaters, the consequences which were so to manifest themselves that a final account might be struck were the consequences of defendant’s interference with the floodwaters.
Similarly, upon proof that the exchange waters from the Sacramento Delta were inferior in quantity or quality to the waters of the San Joaquin, claimants might have been heard more than 6 years after the substitution was effected in 1953, upon a showing of the need for time within which the consequences would so manifest themselves that a final account might be struck.
Plaintiffs’ contentions in relation to Diohimon are not limited by any such specifics as the foregoing. They assert that the source of their claims is the development of the Central Valley project. They maintain, accordingly, that a landowner who asserts a timely claim for alleged deterioration of substitute waters is entitled to recover for the loss of floodwaters as well, since he has merely postponed suit until the consequences of the Central Valley project have so manifested themselves that a final account may be struck.
Such a rationalization represents, in my opinion, an unwarranted extension of the Diokmson doctrine.
The statute of limitations expresses a policy against the litigation of stale claims which is as deeply rooted in common law jurisprudence as is the principle of paying compensation for private property taken for public use.
Acceptance of plaintiffs’ position, and its application in practice, would put the Dichmson doctrine in unending conflict with the statute of limitations. This was never the purpose of the decision.
The Central Valley project, like the Tennessee Valley Au- *657 tbority, is a dynamic undertaking. If any landowner whose water rights are in any manner affected by the Central Valley project may postpone suit “until the situation becomes stabilized,” using the Central Valley project as a whole as the “situation,” there would be no end to the potentials for litigation. Unless the effects of the project can be identified within reasonable limits and ascribed to some specifics in point of time, suits for the loss of floodwaters of which the landowner was deprived in the 1940’s would lie in the year 2000 and beyond.
There must be a middle ground between the open-end application of the Diehinson doctrine for which plaintiffs contend and premature foreclosure by res judicata to which the Diehinson opinion refers. The proscription against piecemeal litigation which requires a claimant to assert in one suit all of the claims he then has does not mean that he may not, at a later time, file another suit based on a claim which has since arisen.[3]
m
Valuations
With respect to valuations, plaintiffs assert that “* * * the test is the difference between the market value with and without the burden * * ; that “since the taking is assigned
the date of March 14, 1950, the loss of market value must be determined as of that date”; and that “the burden of the servitude imposed by defendant’s taking” was the Central Valley project as a whole, beginning with the construction of FriantDam.
In support of the rule that the test is the difference between the market value with and without the burden of the servitude, plaintiffs cite Slattery Company v. United States, *658 231 F. 2d 37 (5th Cir. 1956); United States v. 2,648.31 Acres of Land, 218 F. 2d 518 (4th Cir. 1955); 18 Am. Jur. Eminent Domain, sec. 252, p. 890 (1938), sec. 355, p. 999 (1938); and United States v. Virginia Electric & Power Co., 365 U.S. 624 (1961).
American Jurisprudence (vol. 18, sec. 252, p. 890) contains the following statement:
* * * When land is flowed for the development of water power, the owner’s damage for its taking is measured by the difference 'between the value of his land after the condemner has flowed it and what it would have been worth on the date of its taking if the defendant's dam had not been built; that is, the difference between the value of the land free from, and subject to, the rights taken. (Emphasis supplied.)
The foregoing passage was cited with approval in United States v. 5,648.31 Acres of Land, supra (at 523). In that case the United States had filed a declaration of taking of the “full, complete, and perpetual right * * * to overflow, permanently or intermittently * * * ” the lands in question “* * * as a result of the construction, maintenance and operation of the John H. Kerr Dam and Feservoir * * *” on the Foanoke Fiver in Virginia and North Carolina. The trial judge awarded the owners the full fee simple value of the several tracts, excluding testimony offered by the Government tending to show that the decrease in value was less than the value of the fee since only intermittent flowage rights were taken. The United States appealed. The Court of Appeals reversed. The opinion, by Chief Judge Parker, sets forth a detailed statement of the reasons why the condemner should pay for an easement rather than the fee. The reference to the method of valuation was more or less incidental.
The Slattery decision turned squarely on methods of valuation in eminent domain, and the court came to grips with some, but not all, of the valuation problems inherent in the instant case. The Slattery Company owned a tract of 1,200 acres—
* * * situated a short distance south and in the direct path of growth of the City of Shreveport, Louisiana. Numerous suburban residential subdivisions [had] * * * *659 been opened near the property, and it [was] most likely that * * * a large portion of it [would] be encompassed by the normal growth of Shreveport.
The land [had] been owned by the Slattery family for more than sixty years * * * [and] because of its proximity to * * * Shreveport, was being held * * * for subdivision purposes, which was its highest and best use.
The Wallace Lake Beservoir dam project was authorized in 1938 and completed in 1946. In 1952, the United States filed a Declaration of Taking and obtained a judgment of taking expropriating a fiowage easement over 915.4 acres of Slattery’s 1,200-acre tract. The lands covered by the flooding servitude were all of the lands lying below the 165-foot contour. The flowage easement permitted the Government to remove all timber below the 150-foot contour, prohibited the construction of buildings below the 158-foot contour, and required the removal of all buildings presently situated below that contour.
The trial court confirmed the report of the Commission and entered judgment accordingly. The condemnee assigned six specifications of error as reasons for reversal of the judgment. The Court of Appeals reversed the judgment and remanded the cause for further proceedings on the basis of the condemnee’s Specifications of Error Nos. 3 and 4, which were as follows:
(3) The proper compensation for a flooding easement is the difference between the fair market value of the land before the taking and after the taking. The Commission erred in merely assessing “damages” for the taking and in not fixing the fair market value of the land after it was burdened with the flooding easement.
(4) The Commission erred in merely assessing damages for the taking and in completely ignoring the after taking value of the property fixed by all expert witnesses in the case, including the Government’s witnesses as well as the landowner’s witnesses.
The judgment of the trial court was reversed because of error by the Commission in failing (1) to fix a market value of the land after it was burdened with the flooding easement and (2) to include all of the tract in its assessment of damages.
*660 The failure of the Commission to fix a market value after the taking was largely attributable to the confusion arising from the “before-and-after” date of the declaration, when the burden had existed in fact if not in law for more than 6 years before that date. It is this feature of Slattery which makes it instructive in the present situation. In the instant case, there is no problem about finding a market value of plaintiffs’ 'lands after the date of taking upon which plaintiffs rely (March 14, 1950). The problem is in finding a market value of those lands before the taking, since the “burden” had existed in fact if not in law for several years prior to March 14,1950.
Plaintiffs, in their brief, say (p. 46):[4]
* * * It would, of course, be difficult, if not impossible, to find evidence of sales of comparable lands without the burden at the time of taking, i.e., the value in 1950 if Friant Dam and the Delta-Mendota Canal had not been built.
In Slattery, on the other hand, no such problem existed in relation to the market value of the land before the taking, since “numerous suburban residential subdivisions [had] * * * been opened near the property.”
Plaintiffs suggest, moreover, that “[T]he value immediately before the taking would be a depressed value due to the prospect of the forthcoming taking,” and that the “with and without” test eliminates this injustice, noting the reference in Slattery to the “threat and menace” of the proposed taking having hung over the property for more than 10 years.
They therefore urge the test of with and without the burden on the basis of estimated market values of plaintiffs’ lands in March 1950 if the Central Valley project had not been authorized in 1939 and if Friant Dam and the Delta-Mendota Canal had not been built. They assert (p. 48) that “[T]he value of plaintiffs’ land in March, 1950, if the dam and canals had not been built, i.e., without the burden of defendant’s taking, can be established by estimate *661 or opinion of persons informed on real estate values in the area involved,” citing the following passage from Olson v. United States, 292 U.S. 246, 257 (1984):
Flowage easements upon these lands were not currently bought or sold to such an extent as to establish prevailing prices at or as of the time of the expropriation. As that measure * * * is lacking, the market value must be estimated.
In Olson, the lands upon which flowage easements were acquired “* * * [were] situate in two countries, and [were] held by very numerous private owners, by Indian Tribes and by sovereign proprietors * * and “there was no element of value belonging to the landowners that could legitimately be attributed to use and adaptability of their lands for reservoir purposes * *
Plaintiffs’ brief continues (p. 48) :
The rule_ is well established without contradiction, that the opinions or estimates of persons sufficiently informed on real estate values in the neighborhood, are admissible and entitled to consideration in fixing loss of value. * * * [Citing] 18 American Jurisprudence §355, p.899. * * *
* * * No one opinion is, of course, conclusive. The weight to be given .to such testimony by the Commissioner will depend on the qualifications of the witness, i.e., the extent of his knowledge of such real estate values, his credibility, impartiality, etc., and the effect of cross examination and conflicting testimony.
Plaintiffs rest their case accordingly upon the opinions of their valuation witnesses as to the market value of the lands in March 1950, if Friant Dam had never been built, as compared to the market value of those lands in March 1950, accepting the presence and effect of Friant Dam.
Defendant does not concede the validity of plaintiffs’ theory of the case as to the date of taking, the statute of limitations, the striking of a balance under the DioJemson doctrine, or the methods of valuation.
As to takings, defendant concedes (1) that the construction and operation of Friant Dam resulted in a taking of the floodwaters and flows in the high channels of the San Joaquin Eiver; and (2) that, assuming damage to the return flow *662 of irrigation water or to the ground water table by the increased salinity of the exchange waters from the Sacramento, there would have been a taking as a result of the introduction of the exchange waters.
Claims for the loss of ñoodwaters and flows in the high channel are, defendant says, barred by the statute of limitations. They were actionable as early as 1944 or 1945, and had fully matured by 1948, in ample time for the striking of a balance well before March 10, 1949, the applicable date of the statute of limitations.
As for claims based upon the increased salinity of the exchange waters, defendant’s position is that plaintiffs have failed to prove damage to their lands as a result of the exchange waters.
The expert witness on valuation on whom defendant places its main reliance based his appraisals upon actual values of plaintiffs’ lands in March 1950 and compared them with values of the same lands in 1960. He made no effort to fix the value of the lands in 1950 without what nlaintiffs call the “burden,” i.e., as if Friant Dam and the Delta-Mendota Canal had not been built or building.
Plaintiffs ask that his testimony be disregarded, as being of no consequence whatever, since his appraisal is not what the law calls for.
By the same token, defendant would have the testimony of plaintiffs’ valuation witnesses disregarded as unsound and unrealistic.
With two such widely divergent theories of the case as the predicate for valuation testimony, decision of the case turns not so much upon the weighing of the testimony of experts, one against another, as it does upon a choice between the two approaches.
rv
The Element of Certainty
Plaintiffs’ attorneys have done a tremendous amount of work in preparing and presenting the case for their clients *663 as a group, for each client, and for each of the claims of each of their clients. No detail has been left unnoticed in or unreconciled with their rationalization. The more one studies the case, however, the more apparent it becomes that the whole structure is a rationalization.
As plaintiffs have acknowledged in interim briefs to the commissioner, they learned from the decision in the Wolfsen case[5] that recovery for impairment of return flow irrigation water by reason of the exchange of waters would depend upon proof of actual rather than technical damage.[6]
By the time Wolfsen reached the court through the report of the commissioner, it was apparent that, by agreement of the parties or otherwise, the issue of the statute of limitations had been eliminated. The only claim being pressed was for deprivation of riparian rights resulting from the exchange of waters, which had been begun as late as 1951, a date well within the 6-year period back of 1955. It is not apparent from the record what effect, if any, the elimination from Wolfsen of the statute of limitations as an issue had upon the preparation or presentation of the claims of plaintiffs in the instant case.
What is apparent is that in the instant case the claims of 27 owners of 35 parcels of land were combined in 19 counts of one petition. These claims extended over the gamut of water rights, from deprivation of floodwaters and flows in *664 the high channel, to impairment of the ground water table and deterioration of return flow irrigation water resulting from the exchange of waters, and the destruction of potentials for entertainment and recreation facilities. Several individual claimants have asserted losses of more than one kind.
Instead of sorting out the claims for presentation in terms of specific water rights taken at specific times, plaintiffs have undertaken to devise a conceptual umbrella large enough to shelter them all. Using the various types of water rights as stays, the concept would draw across them the canvas of the Central Valley project as a whole, which surely would be ample for the purpose. The stays, however, had to be joined to the stem (for which the plaintiffs used the “event” upon which they rely as the taking); and at this point the concept falls apart for lack of proper joinder because the stem itself is faulty.
The “event” upon which plaintiffs rely as the taking is not the achievement of full operation of the Friant-Kern Canal on March 14, 1950, but the mere fact that the canal had been completed and was ready for operation on that date. The date of this “event” has the advantage of being within the 6-year period of limitation. There, however, the advantage ends.
Until July 1953, the San Joaquin water available to plaintiffs consisted of (1) the return flow of irrigation water in the low channel during the irrigation season; (2) the-ground water table; and (3) the flows, during times other than the irrigation season, which have been described here-inabove as flows in the high-low channel, representing releases from Friant Dam for flood control and other maintenance of storage space behind the dam. It has been noted heretofore that these flows in the high-low channel were more consistent (extending over a longer period of time at a more uniform volume) than had been the case before the controls of Friant Dam became operative.
The full operation of the Friant-Kern Canal in July 1953-deprived plaintiffs of these flows in the high-low channel. *665 Such, flows were distinctly a creation of Friant Dam. They-never existed before Friant Dam was built. Before Friant. Dam there had been flows of floodwaters (winter and spring)* and in the high channel before and after each runoff of flood-waters. This regimen was altered by the controls of Friant Dam. Plaintiffs had not enjoyed the floodwaters or the flows; in the high channel in a manner adaptable to the customary-regimen of native and permanent pasture since sometime-prior to 1947.
At this point, plaintiffs invoke the Dickinson doctrine and' insist upon adherence to the 1950 “event” in the interest of permitting the consequences so to manifest themselves that; a final account may be struck. In support of such adherence-they rely upon plausibility by inference rather than upon? empirical evidence to show the need for túne for the situation? to become stabilized.[7]
With respect to claims of diminution resulting from-increased salinity of the exchange waters, plaintiffs still adhere to the taking date of March 1950, although the exchange did not begin until 1951 and was not complete until 1953. They say they “are entitled to have considered ini fixing the amount of their recoveries, all damages foreseeable and prospective as of the date of the taking.” This; is true, of course, as a matter of law; but one wonders why,, as a practical matter, the taking date of 1953 would not have-served their purposes better. Surely it would have made for-more certainty in the proof of damages, and plaintiffs’ case-for invoking the Dickinson doctrine would have been? strengthened.[8]
*666 Haying constructed their case along these lines, plaintiffs now ask the court to accept, as the basis of valuation, the difference between the market value of the lands in 1950, immediately after March 14, and the market value of those lands in 1950, immediately before March 14, the latter value to be determined by estimate as if Friant Dam had never been built. Such an estimate, manifestly, can hardly rise above conjecture.[9]
Plaintiffs’ reason for having constructed their case along the lines indicated is based on their endeavor to comply with the precedents which say that the measure of damages is the difference in value of the lands not taken with and without the burden of the servitude.
As indicated in the discussion hereinabove of the statute of limitations, plaintiffs’ selection of the Central Yalley project as a whole to represent the burden of the servitude overshoots the mark, in my opinion. If, as indicated in both Slattery, supra, and United States v. 2,648.31 Acres of Land, supra, the imposition subsequently of a servitude greater than the one initially imposed entitles the landowner to additional compensation if the value of the lands is adversely affected thereby — if this is true of the effects of a single dam, it should be true, a fortiori, of a whole project.
Plaintiffs’ approach to valuation through estimated market values in March 1950 is not based upon the “best evidence” (using that phrase in its original context[10]). There is inherent in it so much uncertainty that, when weighed against other valuation evidence, it must be accorded a position subordinate to evidence of greater certainty.
*667 V
Decision
In my opinion, no taking occurred on March. 14,1950. In terms of what actually happened, it would be more nearly accurate to say that the full operation of Friant Dam in 1947 resulted (1) in the taking of the former regimen of the river in relation to nonirrigation season flows — flood-waters (winter and spring), and flows in the high channel before and after the flood runoffs; and (2) in the imposition of a servitude upon the high-low channels of the river to carry off releases from Friant Dam in a regimen quite different from that of pre-Friant years. Upon full operation of the Friant-Kern Canal, the burden of this servitude was radically altered. It was not altogether lifted, but it was reduced in point of time and volume to a much lesser servitude. This was what occurred in July 1958.
It is questionable whether plaintiffs acquired rights in the flows of the river hereinabove ascribed to the imposition of a servitude. They do not complain of a servitude as such.
The evidence fails to establish need on the part of plaintiffs for postponing suit later than March 10, 1949 (the cutoff date of the statute of limitations), for damage resulting to them from the deprivation of floodwaters and flows in the high channel. Such evidence as there is bearing on the point, when considered in the light of the known history of the region, including earlier cases in this court based on similar claims for comparable land, warrants the conclusion that conditions were ripe for the striking of a balance prior to 1949. The Dickinson case therefore has no application.
In my opinion, claims for the deprivation of floodwaters and flows in the high channel are barred by the Statute of limitations, having accrued (and the consequences thereof having so manifested themselves that a final balance could be struck) prior to March 10,1949.
Such recreation values as may have inhered in some of plaintiffs’ lands were dependent upon the floodwaters and *668 flows in the high channel. When plaintiffs were deprived of those nonirrigation season flows, their recreation values were impaired. Their causes of action arose at that time,, and were barred before March 10,1955. Continuation of recreational activities, insofar as made possible by releases from Friant Dam after 1947, was incidental, as being by coincidence rather than by right.-
The substitute waters of the Sacramento, first introduced into Mendota Pool in 1951, with the substitution made complete in 1953, were more saline than the waters theretofore-supplied from the San Joaquin.
Plaintiffs’ contention that the effect of this increased salinity could have been anticipated in March 1950, to the extent of forecasting a diminution of value in plaintiffs’ lands resulting therefrom, is unrealistic. At the trial of the case in October 1961, expert witnesses testified for hours on the effects of the increased salinity manifest as late as 1960 and 1961, without agreement that there was any deleterious effect on either the surface waters (return irrigation flow) or the ground water table. Some witnesses said there had been injurious effects; others said there had not been. The nature of their testimony makes it highly improbable that market values would have been affected in March 1950 because of the prospect of increased salinity evident at that time only in the delta into which the Sacramento River then emptied.
The test of there having been a taking as a result of the increase of salinity in the substitute waters is, of course, whether or not there was a diminution in value of any of plaintiffs’ lands because of the effects of the increased salinity. Since, as noted above, there was no certainty that the increased salinity would affect the waters adversely, and no marked anticipation thereof, the possibility that such a diminution did occur prior to 1953 and h'ad by that time been discounted is quite remote.
The greater weight of the evidence warrants the finding that no diminution in value occurred in 1950, or has occurred since that time with respect to any of the lands in suit. On the contrary, there appears to have been an appreciation of values of all of the lands in suit since 1953.
*669 CONCLTJSIOK OS' LAW
Upon the foregoing findings of faot which are made a part of the judgment herein, the court concludes as a matter of law that none of the plaintiffs is entitled to recover. The petition is therefore dismissed.
APPENDIX

*Contents Page

Table I 1947 — Diversions and Streamflow, San Joaquin River between Friant Dam and Vernalis.
Table II 1948 — Diversions and Streamflow, San Joaquin River between Friant Dam and Vernalis.
Table III 1949 — Diversions and Streamflow, San Joaquin River between Friant Dam and Vernalis.
Table IV 1950 — Diversions and Streamflow, San Joaquin River between Friant Dam and Vernalis.
Table V 1951 — Diversions and Streamflow, San Joaquin River between Friant Dam and Vernalis.
Table VI 1952 — Diversions and Streamflow, San Joaquin River between Friant Dam and Vernalis.
Table VII 1953 — Diversions and Streamflow, San Joaquin River between Friant Dam and Vernalis.
Table VIII 1946 — Diversions and Streamflow, San Joaquin River between Friant Dam to and including “Fremont Ford”.
Table IX 1947 — Diversions and Streamflow, San Joaquin River between Friant Dam to and including “Fremont Ford”.
Table X 1948 — Diversions and Streamflow, San Joaquin River between Friant Dam to and including “Fremont Ford”.
Table XI Percentage of 60-year normal or average annual flow of San Joaquin River below Friant.
Table XII Tabulation, by counts, of plaintiffs and parcels.
Table XIII Lands identified by count number and parcel, indicating acreage that is riparian, contiguous, and nonriparian.
Table XIV Detailed tabulation of lands within and without CCID, with distinctions between croplands and pasturelands.

*670

*671

*672

*673

*674

*675

*676

*677 Table VIII. — 1946—Diversions and streamftow, San Joaquin River between Friant Dam to and including “Fremont Ford” [Amounts in acre-feet]

Table IX. — 19Jfi—Diversions and streamftow, San Joaquin Rweft between Friant Dam to and including “Fremont Ford”
[Amounts in acre-feet]

*678 Tabus X. — 1948—Diversions and streamflow, San Joaquin River 'between Friant Dam to and ineludmg “Fremont Ford,"

Table XI. — Percentage of 60-year normal or average ammual flow of San Joaquin River below Friant
Tlie percentage of the 60-year normal or average annual flow of the San Joaquin River below Friant (computed over the years 1880 to 1849) for the years specified below, is as follows:

Percent

1946. 92
1947. 1948. 59 64
1949. 62
1950. 70
1951. 98
1952. 162
1953. 1954. 63 64
Taken from a publication of the California State Department of Public Works — Division of Water Resources — entitled “Report of Sacramento-San Joaquin Water Supervision, 1954,” table 2, p. 50.

*679

*680 Table XIII. — Lands identified by count number and parcel^ indicating acreage that is riparian, contiguous, and nonriparian

*681 Table XIV. — Detailed tabulation of lands within and without CCID, %oith distinctions between croplands and pasturelands

Tlie trial commissioners memorandum opinion appears after finding of fact No. 113.

 “* * * ¡the San Joaquin River has debouched at or near Friant for more than a million years; * * * during the period1 of building its alluvial cone, it flowed in other channels * * * and deposited therein boulders, cobbles, gravel, sand and other aUuvial material * « *, the heavier and coarser material oeing deposited first and the fines last; water will flow underground through such coarse material more readily than through finer material; those channels changed from geologic time to geologic time * * * ; after those channels were changed, finer alluvial material * * * dust * * * and other action of the elements filled the channels over which form what is known as aquifers * * * ; such aquifers * * * branch out from [the bed of the river], much as the branches of a bush or tree all stem from the main trunk * * * ; such aquifers are buried and are at different depths; the depth * * * to * * » basement rock * * * varies from a few hundred feet at Friant to several thousand feet *565 in tlie vicinity of Biola * * *; the aUuvial cone of the San Joaquin River embraces all of the lana -within * * * what has been referred to throughout the trial as the ‘Lee’ lines * * * [being the area from Friant to Mendota].” Rank v. Krug, 142 F. Supp. 1, 46-47 (1956).

 The movement might be faster or slower, depending upon the character and porosity of the soil.

 Hereinafter referred to as Miller & Lux.

 A cubic foot per second, also called a second-foot, is the rate of discharge flowing in a channel of a rectangular cross-section 1 foot wide and 1 foot deep at an average velocity of 1 foot per second.

 Water flowing at the rate of 1 cubic foot per second for 24 hours will produce a volume of water equal to approximately 2 feet in depth covering 1 acre, or 2 acre-feet.

 These rights were given protection in defendant’s plan for development of the Central Valley project.

 All tables are In the Appendix.

 Plaintiffs were offered the opportunity to go to trial in June 1956, at the same time as the Wolfsen ease, infra, fn. 17, but asked for and were granted a continuance on the ground that additional time was needed to complete their engineering data. Thereafter, the parties engaged in discussions of possible settlement for 3 years or more. Erom these discussions there resulted a stipulation of facts as the basis of a motion by defendant to dismiss the action. The motion was denied in January 1961.

 Apparently, no significance attaches to the sequence of the counts.

 Count 1, 2,217 acres, owned by tbe Gustlne Land & Cattle Co.; and tbe Freitas lands, In Count S, 4,578.80 acres; Count 9, 1,881.19 acres; Count 11, 3,802.6S acres; and Count 12, 3,986.17 acres.

 Tie primary significance of tie divisions into parcels lies in tie derivation of title, witi attendant indications of riparian or nonriparian status and, in some instances, indications of exceptions and reservations in deeds.

 Tie named plaintiff or named separate groups of plaintiffs appearing in eaei of tie counts of tie petition as amended were, at all times material, tie respective owner or co-owners in fee and in possession witi rigit to possession of tie lands described in the count in which the name or groups of names appear, with the exception that Irma Freitas was sole owner of tie lands described in Count 17. Tie descriptions of the lands of all of tie plaintiffs, except those named in Counts 7 and 13, are correctly set out in tie respective counts of the petition. Tie description of the lands of tie plaintiffs named in Counts 7 and 13 are correctly set out in tie First Amendment to plaintiffs’ petition. Tie descriptions set forth in tie petition and amended petition are Incorporated herein by reference.

 See Appendix.

 Gerlach Live Stock Company v. United States, 111 Ct. Cl. 1, 76 F. Supp. 87 (1948), aff'd 339 U.S. 725 (1950); J. Sheldon Potter v. United States, 111 Ct. Cl. 1, 76 F. Supp. 87 (1948), aff’d, 339 U.S. 725 (1950); Martin Erreca v. United States, 111 Ct. Cl. 1, 76 F. Supp. 87 (1948), aff’d, 339 U.S. 725 (1950); Martin Erreca, et al. v. United States, 111 Ct. Cl. 1, 76 F. Supp. 87, cert. denied, 335 U.S. 884 (1948); James J. Stevinson (a Corporation) v. United States, 111 Ct. Cl. 89, 76 F. Supp. 99 (1948), aff’d, 339 U.S. 725 (1950); Archibald J. Stevinson v. United States, 111 Ct. Cl. 89, 76 F. Supp. 99, aff’d, *590 339 U.S. 725 (1950) ; S-H Securities Company v. United States, 111 Ct. Cl. 89, 76 F. Supp. 99, aff’d, 339 U.S. 725 (1950); East Side Canal & Irrigation Company v. United States, 111 Ct. Cl. 124, 76 F. Supp. 836 (1948). Consolidations placed Gerlach, Potter, Erreca, sole, and Erreca, et al., together, in one decision, the two Stevinsons and S-H Securities in another, while East Side Canal was a separate decision.

 Similar judgments were entered In favor of the two Stevinsons and S-H Securities.

 The lands of the two Stevinsons and S-H Securities are downstream from the Gerlach lands, and are in Merced and Stanislaus Counties, as are the lands of the plaintiffs in the instant case.

 142 Ct. Cl. 383, 162 F. Supp. 403 (1958), cert. denied, 358 U.S. 907 (1958). As heretofore noted, the case was tried in June 1956.

 This was 12 days after the filing of the petition in the instant case. The two cases were filed, developed!, and tried by separate counsel for claimants.

 The position of counsel for claimants in relation to the statute of limitations was not disclosed, since no issue was made of the statute.

 142 Ct. Cl. 383, 389.

 United States v. Dickinson, 331 U.S. 745 (1947). The Government, -without condemning the claimants’ land, dammed a river and raised the water level by successive stages until it flooded part of claimants’ land. More than 6 years after the dam began, to impound water, but less than 6 years after the water reached its ultimate level, the claimants sued for compensation under the Tucker Act. The Supreme Court held that the claim was not barred by the C-year limitation, saying (p. 749) that: “* * * The source of the entire claim — the overflow due to rises in the level of the river — is not a single event; it is continuous. And as there is nothing in reason, so there is nothing In legal doctrine, to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized. An owner of land! flooded by the Government would not unnaturally postpone bringing a suit against the Government for the flooding until the consequences of inundation have so manifested themselves that a final account may be struct. * * *”

 In support of their contention that the crucial valuation test is the difference between the market value with and without the burden of the servitude, plaintiffs cite Slattery Company v. United States, 231 F. 2d 37 (5th Cir. 1956); United States v. 2,648.31 Acres of Land, 218 F. 2d 518 (4th Cir. 1955); 18 Am. Jur. Eminent Domain, § 252 (1938), p. 890, § 355, p. 999; and United States v. Virginia Electric & Power Co., 365 U.S. 624 (1961).

 P. 46.

 P. 48.

 Citing Olson v. United States, 292 U.S. 246 (1934).

 The conveyances by which Miller & Lux deeded lands to certain of the plaintiffs herein were executed between the years 1981 and 1935.

 This Seed was the one under which the wolfsens acquired their lands from Cyrus W. Sheppard, the water reservations in said deed being construed by this court in the Wolf sen case.

 The lands in Count 1 are not contiguous to the river or its sloughs, but had flow rights to 4,000 acre-feet of the annual snowmelt floods of the San Joaquin, usually available between April 1 and June 15.

 See Appendix.

 Plaintiffs’ position is (1) that water bought by them from CCID had been degraded by salinization in similar manner (albeit not to the same extent) as return flow waters as a result of the substitution of waters at Mendota Pool; and (2) that defendant, haying caused the salinization, is responsible for any loss suffered as a consequence. Defendant’s position is that under no circumstances can it be held responsible for the quality of water which the users acquire by the purchase, independently of any legal rights thereto.

 See Appendix.

 Finding 22(a).

 Finding 24(d).

 The concept of a salt balance, except as a generalized rule of thumb, Is theoretical and of questionable significance.
Plaintiffs’ witnesses relied heavily on textbook materials, some published by agencies of the Federal Government, to demonstrate that the quality of their water has deteriorated to a point that it is dangerous to use. These texts, as stated by a witness for defendant, are subject to interpretation. They may put up warning flags from time to time when the quality of the water reaches certain concentrations in terms of parts per million or total dissolved solids. The fact remains that the circumstances of each area and of each farm in the area are different and require separate consideration.

 Most of the influence of the west side streams is noted on Count 1 land and the irrigated croplands bordering on Orestimba Creek.

 Before the trial of the action, defendant filed a motion to dismiss many of the claims here asserted (particularly those based on deprivation of flood-waters and flows in the high channel) as being barred by the statute of limitations. The petition had asserted damage to the lands in question by reason of Interference with (including subsidence of) underlying ground waters. Defendant’s motion was denied on the ground that plaintiffs were entitled to a trial with its attendant opportunity to prove, if they could, the damage alleged, as being within the purview of the Dickinson doctrine. (United States v. Dickinson, 331 U.S. 745 (1947).)

 The occurrence of brackish water in the unconfined ground water table is not to be attributed to a mixture of it with the saline connate waters far below the Corcoran clay. As between the connate waters and the fresh water which was also below the Corcoran clay, a mixture did sometimes occur, resulting in the production of brackish water from deep wells. When shallower wells produced brackish water, however, the cause was the presence of salt beds or other concentrations of salts in the soil.

 Pumping has only a limited effect on the movement of ground water, because of the size of the area as compared to the number of pumps. Where there is a sufficient drawdown by the action of pumps, a cone of depression is formed in the water table and the water, seeking its own level, will move into the depression. This movement is likewise at the rate of approximately 1 foot per day, varying with the porosity of the soil.

 A comparison of the quality of the ground waters taken from wells throughout the area involved in this litigation and adjoining areas for periods prior to the operation of the Central Valley project and for periods subsequent to the operation of the project indicates no systematic change in the quality of the ground water. Some wells show degradation of the quality of the water after activation of the project, and some Show marked improvement.

 As hereinafter noted, the lost “flushing” or “cleansing” action was readily replaceable by additional leaching.

 Positive ions, so-called because in electrolysis they travel to the cathode.

 Negative ions, so-called because in electrolysis they travel to the anode.

 The measure of electrical resistance is the ohm, named for the man who devised it. Mho is the opposite measure (of electrical conductivity) expressed by spelling ohm backward. Millimhos and micromhos are measures of degree.

 Some of the engineering formulas built around these abbreviations suggest the compactness of 15=Me2.

 For example, in areas where the level of the ground water is high enough to penetrate the root zone, thus interfering with agriculture, landowners have heretofore joined into districts for the purpose of correcting the situation by-installing ditch drains which are led into the river, or by installing shaUow draft pumps to draw down and lower the water table. In these instances, when the drawdown water is of good quality, it is sometimes used for irrigation. When it is poor in quality, it is wasted.

 Counts 8, 9,10,11,13,15, 17,18, and 19.

 Gustine purchased the lands from Miller & Lux in 1926 and 1931. The deeds carried certain exceptions and reservations as set forth in finding 58(a).

 In 1871, Miller & Lux arranged -with one of its subsidiary canal companies to construct dams and ditches to free parts of the flood plain owned by Miller & Lux from the uncontrolled annual floods by diverting and channeling some of the floodwaters into definite canals and watercourses. The canal company accordingly diverted floodwaters through China Slough into the main canal from which such waters were sent onto and across the Gustine lands (then owned by Miller & Lux) through Los Garzos and Los Banos Creeks.

 The several wells of Gustine were of doubtful efficiency. They are not now in issue.

 The use of the land for duckponds and duck shooting has not been affected by Friant Dam. It is not in issue.

 Claimants contend that the tract, being contiguous to the river, is likewise riparian to it. Defendant does not concede the riparian status. In view of the findings made herein on other relevant matters, the issue of riparian status is immaterial.

 Whether the land was riparian, as its owner contends, or not riparian, as defendant contends, is immaterial in view of findings herein on other issues.

 The owner claims a potential for these 8 acres as a recreation area.

 At the time of trial in 1961 some of this land was growing salt-sensitive ladino clover.

 These 237 aeres Included all of the 106.68 acres In Parcel 1 (away from the river) and 130 acres of Parcel 2.

 These 7S acres were all part of Parcel 2.

 The Crawfords contend that these 5 acres had a potential (absent the project) for development as a recreation area.

 The claimants contend that the whole of Parcel 2 (213 acres) suffered from a lowering of the ground water table after Friant Dam, thereby depriving them of valuable subirrigation. This claim is not supported by the evidence.

 The return flow available to the owners of Count 4 land was subject to prior use by Miller & Lux and its successors in interest along the San Joaquin above the mouth of the Merced River, by withdrawals from the Merced River, and by withdrawals along the San Joaquin below the mouth of the Merced by upstream users for a distance of 36 miles, including the Patterson Irrigation District.

 Specifically, the owners of the Count 4 land complain of (1) deprivation of San Joaquin water through the exchange of water at Mendota Pool, which they say resulted in (i) salinization of their irrigation water taken from the river and of the ground water table, (ii) permanent salinization of the soil resulting from the use of saline irrigation water, (iii) increased cost of leaching, and (iv) loss of productivity of land ; and (2) deprivation of the ordinary, nonirrigation season flows of the river as resulting in a loss of recreational value in the 5 acres of riverbank.

 Claimant contends that this area had a potential for recreational develop-, ment.

 Specifically, this claimant lists as harmful effects of the Central Valley-project (1) the deprivation of San Joaquin water as the source of both CCID-deliveries and the return flow of irrigation, contending that the substitute-waters have resulted in increases in (i) the salinity of waters from both sources, and (ii> the cost of leaching, and (2) the deprivation of the ordinary-nonirrigation season flows of the river, ascribing to it the loss of recreational! values of the 28 acres of riverbank land.

 Dr. Crow received Parcels 1 and 2 through inheritance. They have never been severed in such a way as to deprive the outer parcel of Its riparian status.

 Specifically, the claimant lists as harmful effects of the construction and operation of the Central Valley project: (1) To Parcel X: (,i) Increase in salinity of CCID water; (ii) Cost of extra leaching, and (2) To Parcels 2 and 3 : (i) Increase in salinity of the river and well water for irrigation; (ii) Cost *635 of additional leaching; and (ill) Reduction in productivity due to increase in soil salinity with reduction in yield of salt-sensitive plants.
All of the foregoing are attributed by the claimant to the deprivation of San Joaquin water following the substitution of waters in 1963.
In addition, the claimant cites deprivation of the ordinary flows of the river as cause for loss of recreational values.

 The claimant contends that it was riparian. Defendant denies its riparian status, but does not challenge the owner’s right to use the available water, surface or underground.

 Cf. footnote 62 and footnote 64.

 Tie lands In Counts 9, 10, 11, and 12 were likewise owned by members of the Freitas family. These holdings, combined, total 14,166.26 acres, or 70.6 percent of the acreage of all of the lands in suit. The holdings were assembled; by an older generation of the Freitas family and were used primarily as grasslands. Some of the acreage was acquired from Miller & Lux.

 There Is no specific evidence to the contrary.

 The whole tract lies along Salt Slongh between Parcels 1 and 2 of Count 8.

 By the time -water reached this tract as return flow, it had been used upstream by Miller & Lux and its successors in interest, through irrigated lands along the Merced River, and by the Patterson Irrigation District.

 In 1954, after the sale by Irma Freitas to the Hubbs group.

 Gerlach Live Stock Company v. United States, 111 Ct. Cl. 1, 76 F. Supp. 87 (1948), aff’d, 339 U.S. 726 (1960).

 Wolfsen v. United States, 142 Ct. Cl. 383, 162 F. Supp. 403, cert. denied 358 U.S. 907 (1958).

 In Slattery Company v. United States, 231 F. 2d 37 (5th Cir. 1956), the court agreed “in principle” with a Specification of Error in a condemnation suit which asserted that it was error “* * * to render judgment upon an award of compensation based upon the flooding caused by the dam of * * * [a], specific design without reserving to the landowner the right to sue for additional damages if any structural changes are made in the dam which would cause additional flooding.”
See also United States v. 2,648.31 Acres of Land, 218 F. 2d 518, 522 (4th Cir. 1955), where the court said: “If in the future * * * a greater servitude should be placed upon these lands by changes in the dam, we have no doubt that the owners will be entitled to additional compensation if the value of the lands is adversely affected thereby.”

 The sentence quoted below Is preceded by the following: “The Commissioner * * * suggested the difficulty in establishing the extent of loss of market value of plaintiffs’ lands under the rule that this is to be fixed at the difference between the value of the land with and without the burden of the servitude imposed by defendant’s taking.”

 The Wolfsens, whose lands lie upstream from and adjacent to the lands of plaintiffs, filed their petition in March 1955, just IS days after the filing of the petition in the instant case. The Wolfsens were not represented by the attorneys who represent the present plaintiffs. Wolfsen was brought to trial in June 1956. The present plaintiffs were offered the opportunity to go to trial at (or about) the same time, but asked for and were granted a continuance in order to complete the assembly of engineering data.

 The Wolfsen claimants, in their exceptions to the report of the commissioner, declined “the opportunity the commissioner’s solution would have afforded them, to try to prove actual, as distinguished from nominal damages as a result of the substitution of waters,” and the court held, in an opinion by Judge Whitaker, that claimants were “not entitled to compensation for a legal technicality.” The opinion further said: “They must first show that something of substance has been taken from them. * * * any impairment there may have been of plaintiffs’ rights amounted at most to a technicality. There is no actual damage as a result of the deprivation of the San Joaquin waters and the substitution of the Sacramento waters.”

 Nowhere in the evidence have the plaintiffs distinguished between diminution in value attributable to the loss of floodwaters and diminution attributable-to the loss of the flows in the high channel which had previously occurred before and after the flood runoffs, although the event upon which they rely as-the taking would provide firmer support for the latter than for the former.

 If plaintiffs had relied upon the .1953 date as the date of taking in relation-to the exchange waters, they would not have needed to invoke the Dickinson* doctrine in respect to those claims. Had there been such a need, however; the foundation for the Dickinson doctrine could have been much more securely-laid in relation to the exchange waters than with respect to the floodwaters- and high-channel flows because of the less obvious effect of salinity. As it is, reliance upon the right to prospective damages for changes resulting from* *666 Increased salinity, while pressing for a Dickinson application to the floodwaters and high-channel flows, discloses an element of artificiality in the approach as a whole.

 The situation here is by no means comparable to the circumstances surrounding Olson, supra, where no evidence of market value whatever was to be had in relation to the lands subjected to flowage easements. Ample evidence was available to plaintiffs of market values of comparable lands as of dates before and after the operation of Friant Dam, in 1947, and before and after the exchange of waters, begun in 1951 and completed in 1953.

 McCormick on Evidence, p. 408.